[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-15878

_____

D.C. Docket No. 1:08-cr-20270-FAM-7

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CARMEN GONZALEZ,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 23, 2016)

Before MARCUS and JILL PRYOR, Circuit Judges, and RESTANI,[*] Judge.

_____

[*] Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

MARCUS, Circuit Judge:

After a two-day jury trial, defendant Carmen Gonzalez was convicted of one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and a separate count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.  The district court sentenced her to serve a total of 84 months' imprisonment.  Gonzalez argues on appeal that (1) the evidence was insufficient to sustain her conviction on either conspiracy count; (2) the two conspiracy charges in effect amounted to one offense, so convicting and sentencing her for both conspiracies violated the Double Jeopardy Clause of the Fifth Amendment to the Constitution; and (3) a series of cumulative trial errors also warrant reversal.  After thorough review and having the benefit of oral argument, we AFFIRM.

## I.

### A.

On April 1, 2008, a federal grand jury sitting in the Southern District of Florida returned a seven-count indictment against Gonzalez and six co-defendants. The indictment alleged that Gonzalez was a nurse at the Saint Jude Rehabilitation Center in Miami, Florida, which purportedly specialized in treating patients afflicted with the human immunodeficiency virus ("HIV").

The indictment charged Gonzalez in two of the seven counts.  In Count 1, the indictment alleged that Gonzalez conspired to defraud the United States; to

2

cause the submission of false claims for medically unnecessary treatments to the Department of Health and Human Services in violation of 18 U.S.C. § 287; and to pay health care kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(2); all in violation of 18 U.S.C. § 371.  Count 2 charged Gonzalez with conspiracy to defraud Medicare and to obtain money from Medicare by means of materially false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. §§ 1347 and 1349.

On April 10, 2008, Gonzalez entered pleas of not guilty and was released on bond.  The district court scheduled a hearing to reconsider Gonzalez's bond for June 4, 2008 at the Government's request after Gonzalez's father (who was also facing indictment) fled the country.  Gonzalez, however, did not appear at the hearing.  Therefore, on June 6, 2008, the district court estreated Gonzalez's bond and issued a warrant for her arrest.  Soon thereafter, she was also charged in a separate indictment with failing to appear in court as directed, in violation of 18 U.S.C. § 3146(a)(1) and (b)(1)(A)(ii).

Meanwhile, two of Gonzalez's co-defendants, Aisa Perera and Mariela Rodriguez, pled guilty pursuant to plea agreements.  The remaining four, Beatriz Delgado, Ana Alvarez, Angel Rodriguez, and Sandra Mateos, proceeded to trial on October 6, 2008.  On October 17, 2008, the jury found Alvarez and Mateos guilty of the charges against them, but acquitted Delgado and Angel Rodriguez.  We

3

affirmed Alvarez's and Mateos's convictions on appeal. See United States v. Mateos, 623 F.3d 1350, 1371 (11th Cir. 2010) (O'Connor, J.).

Gonzalez was rearrested some five years later on September 19, 2013. On October 16, 2013, she pled guilty to the failure to appear charge, signing a factual proffer statement admitting that she knowingly and willfully failed to appear before the district court in connection with the health care conspiracy charges against her. She proceeded to trial, however, on the conspiracy to commit health care fraud charges.

## B.

Gonzalez's jury trial lasted two days. Viewing the evidence in the light most favorable to the Government, and drawing all reasonable credibility choices in favor of the jury's guilty verdict, as we are required to do, see United States v. Boffil-Rivera, 607 F.3d 736, 740 (11th Cir. 2010), the essential facts presented at trial are these. Aisa Perera and Mariela Rodriguez decided to open the St. Jude Clinic. Although the original plan was to open a general clinic, the women were persuaded that there was more money to be made in operating a clinic catering to HIV patients, so Perera and Rodriguez decided to go that route. Perera and Rodriguez were soon put in touch with three brothers, Jose, Louis, and Carlos Benitez. Louis Benitez explained that as long as Perera and Rodriguez could supply a location for the clinic and a doctor with the ability to bill Medicare, he

4

would provide the rest.  That included nurses, patients, transportation for the patients, and, notably, money to pay the patients for coming to the clinic and for the purchase of supplies.  Benitez said that the nurses he provided would know exactly what to do -- how to treat the patients and how to pay them -- when the clinic opened.

St. Jude was set up ostensibly as a clinic to provide Rho(D) immune globulin ("WinRho") infusion treatments to HIV patients with thrombocytopenia.  Thrombocytopenia is a medical condition in which a patient has a lower than normal platelet count.  This can lead to blood not clotting, which can result in excessive bleeding.  WinRho is a medication consisting of concentrated antibodies that treat the problem that causes a person's immune system to destroy his or her own platelets.  In fact, however, the clinic was merely a device for submitting fraudulent Medicare claims.

The clinic itself was described by multiple witnesses as not even looking like a medical office.  Indeed, there was very little medical equipment and the patients were directed to sit in normal household recliners rather than furniture designed for medical use.  Perera went so far as to describe the clinic as looking "more like a handgun place than a medical office."  On the day the clinic opened, Sandra Mateos and Carmen Gonzalez arrived to work as nurses.  Although Gonzalez was not, in fact, a nurse but rather only a technician, she was regularly

5

referred to as a nurse by the witnesses who testified -- a practice we will continue to utilize for the sake of convenience, although it does not affect our analysis in any way. Both nurses came as part of the Benitez brothers' crew that had worked at other clinics operated by the Benitez brothers. Neither Mateos nor Gonzalez received any instruction from Perera or Rodriguez as to what their duties or role would be, and yet both appeared to know exactly what was expected of them in terms of paying the patients and providing treatments. The patients brought into the clinic by the Benitez brothers appeared to be fully familiar with the two nurses when they arrived and some went directly back into the infusion room for purported treatment even before seeing the doctor who was nominally overseeing their treatment for thrombocytopenia.

St. Jude was open three days per week, repeatedly treating the same patients. Those patients were transported to the clinic in groups. Gonzalez and Mateos were generally the only nurses who worked at the clinic. Only the nurses worked in the infusion room, which, notably, was locked in order to prevent government inspectors from entering at will. Behind the locked doors of the infusion room, both Gonzalez and Mateos would allegedly provide WinRho infusion treatment for the patients as well as regularly pay cash kickbacks to the patients. Every time the patients came, the nurses would pay them between $150 and $250 in cash in order

6

to ensure that they would return to St. Jude.   This cash was provided to Mateos and Gonzalez in envelopes supplied by Perera or Rodriguez.

Perera and Rodriguez testified that many of the patients complained loudly about wanting more cash payments and observed that the Center was "getting rich off [their] Medicare."  These tirades often could be heard throughout the clinic and occurred once or twice a week.  Further, testimony at the trial indicated that patients never stayed in the infusion room for longer than 30 minutes.

Gonzalez and Mateos would communicate with Perera about how much of the WinRho medication to order and how much cash they needed to have on hand in order to pay the patients the next day.  Gonzalez and Mateos also regularly filled out infusion sheets detailing the patients' purported treatments, including the length of time they were treated.  Gonzalez herself signed forms reflecting 581 separate instances in which patients were supposedly treated for longer than one and a half hours (including three instances of treatments that lasted longer than two hours), an additional 37 instances where treatments were reported to have lasted for between 30 and 90 minutes, and only seven instances where the treatment lasted less than 30 minutes.  However, WinRho takes less than five minutes to administer.

Expert testimony offered by the Government established that, although at one time 10-15 percent of HIV patients needed treatment for thrombocytopenia --

7

the condition purportedly being treated at St. Jude -- this condition has become extremely rare since the mid-1990s thanks to the availability of an effective cocktail of HIV medications. Indeed, an expert witness called by the Government, Dr. Michael Wohlfeiler, testified that over the last nearly 20 years of treating HIV patients, he had occasion to prescribe WinRho, at most, two times. Nevertheless, Gonzalez signed treatment logs claiming to have administered WinRho to patients whose platelet counts were, at a minimum, three times too high for WinRho to be a medically appropriate treatment. Her treatment logs also showed that she administered the treatment more frequently than was medically appropriate. In fact, WinRho is intended to be administered in a single dose followed by an observation period of three to five days, making the frequency with which it was allegedly provided to patients at St. Jude -- three times per week for some five months -- extremely unusual.

Medicare Part B reimburses payments for certain drugs like WinRho that are administered by a registered health care provider. WinRho comes in a vial of powder which is reconstituted in sterile water before being injected into a patient by an IV line. One vial equals one dose of the medication. During the course of its operations, St. Jude billed Medicare for 1,809 doses of WinRho infusion treatment, but only had 610 doses in its inventory during that period of time, meaning that St. Jude could not have provided all of the infusion treatments it

alleged to have provided in claims filed with Medicare.  The claims that St. Jude submitted to Medicare would separately bill for (1) the WinRho medication, (2) the infusion therapy for up to one hour, and (3) sometimes additional infusion time over one hour.  Medicare paid $4,932 to St. Jude for each WinRho treatment.  Overall, between June 2003 and November 2003, St. Jude submitted approximately $11.3 million in claims to Medicare, and received some $8.2 million in reimbursements from Medicare for the infusions.

## C.

After the close of the Government's evidence, Gonzalez moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that the Government's evidence established no more than that she was present at St. Jude.  Counsel argued that the Government had failed to prove that Gonzalez had agreed to participate in the charged conspiracy.  The district court denied the motion.

The jury found Gonzalez guilty on both conspiracy counts.  On December 20, 2013, the district court sentenced her to 60 months in prison on Count 1 and 84 months in prison on Count 2, to be served concurrently.[1]  The district court also imposed concurrent terms of three years' supervised release upon Gonzalez's

---

[1] The district court also sentenced Gonzalez to 24 months' imprisonment on her failure-to-appear conviction, to run consecutively with her other sentences.

release, ordered restitution in the amount of $8,289,286, and imposed a $200 special assessment. This timely appeal followed.

## II.

## A.

First, Gonzalez claims that the evidence was insufficient to sustain either conspiracy conviction because the evidence failed to prove beyond a reasonable doubt that she knew of the conspiracy at the clinic and that she voluntarily joined it. We review de novo a challenge to the denial of a Rule 29 motion for a judgment of acquittal based on sufficiency of the evidence grounds. United States v. Capers, 708 F.3d 1286, 1296 (11th Cir. 2013). We are also required to review the evidence in the light most favorable to the jury verdict and draw all inferences in its favor. Id. Thus, we are obliged to affirm the convictions "if there is substantial evidence to support [them], 'unless no trier of fact could have found guilt beyond a reasonable doubt.' " United States v. Pineiro, 389 F.3d 1359, 1367 (11th Cir. 2004) (quoting United States v. Lyons, 53 F.3d 1198, 1202 (11th Cir. 1995)).

To sustain a conviction for conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Count 1), the Government must prove "(1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a

conspirator in furtherance of the agreement." United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003). In this case, Count 1 of the indictment alleged that Gonzalez was part of a broader conspiracy to impair the operations of the Department of Health and Human Services in its administration of the Medicare program by presenting false claims to the Department of Health and Human Services for "purportedly medically necessary HIV infusion therapy medications," and by knowingly and willfully paying kickbacks or bribes to patients in order to induce them to come to St. Jude to receive treatments that would be paid for by Medicare.

Moreover, to sustain a conviction for conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349 (Count 2), the Government had to establish beyond a reasonable doubt that: (1) a conspiracy existed to commit health care fraud under 18 U.S.C. § 1347; (2) Gonzalez knew of the conspiracy; and (3) Gonzalez knowingly and voluntarily joined it. See United States v. Moran, 778 F.3d 942, 960 (11th Cir.), cert. denied, 136 S. Ct. 268 (2015). "[I]n a health care fraud case, the defendant must be shown to have known that the claims submitted were, in fact, false." United States v. Medina, 485 F.3d 1291, 1297 (11th Cir. 2007). A person makes a false claim if the treatments that were billed were "not medically necessary[] or were not delivered to the patients." See id. at 1304.

"The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme."  Mateos, 623 F.3d at 1362 (quoting United States v. Molina, 443 F.3d 824, 828 (11th Cir. 2006)).  "A conspiracy conviction will be upheld 'when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to [her].' "  Moran, 778 F.3d at 960-61 (quoting United States v. Vernon, 723 F.3d 1234, 1273-74 (11th Cir. 2013); Mateos, 623 F.3d at 1362).  "[T]he government need not prove that the defendant knew all of the details or participated in every aspect of the conspiracy."  Id. at 960 (quoting Vernon, 723 F.3d at 1273).  Rather, the Government must only prove, beyond a reasonable doubt, that the defendant knew of "the essential nature of the conspiracy."  Id. (quoting Vernon, 723 F.3d at 1273).  The Government can establish that a defendant voluntarily joined the conspiracy "through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy."  Id. at 961 (quoting Vernon, 723 F.3d at 1274).

## B.

Here, there is no real dispute that St. Jude operated with the purpose of defrauding Medicare, nor that there was an illegal agreement to do so.  The only

12

question is whether the Government established beyond a reasonable doubt that Gonzalez was a knowing and voluntary participant in that conspiracy. The evidence presented against Gonzalez was sufficient to support the jury's verdict of guilt on both counts.

For starters, as for Count 1, there was substantial evidence presented that Gonzalez had repeatedly and over an extended period of time (some five months) engaged in the practice of paying kickbacks between $150 and $250 in cash to the patients who came to St. Jude to receive treatments that would be reimbursed by Medicare. Not only was Gonzalez involved in actually handing out payments to each patient she met, she also took a role in determining how much cash the clinic needed to have on hand in order to make the payments. That a purported medical care clinic made extensive cash payments to each patient who walked through its door to receive treatment (rather than the other way around) is, to put it charitably, a most unusual arrangement. The jury surely could have considered this when deciding whether the conspiratorial activity at the clinic was so obvious that knowledge of its character could fairly be attributed to Gonzalez.

But the evidence did not end there. The jury also learned that Gonzalez did not need to be told when she first arrived at the clinic what to do, when to do it, with whom to do it, or how payments were to be made to the patients. Rather, pursuant to Louis Benitez's initial promise and explanation to Perera, the "nurses"

13

knew exactly what to do from the moment Gonzalez first arrived at the clinic, which operated fraudulently from its very first day.  Likewise, the jury could well have inferred Gonzalez's knowledge of the essential nature of the conspiracy from the fact that she regularly made these cash kickback payments to each patient behind closed doors that were locked at all times in order to prevent government inspectors from entering the infusion room at will.

As for Count 2, there was powerful expert opinion evidence that the medical treatments regularly and supposedly provided at the St. Jude clinic -- and billed to Medicare -- were not medically necessary.  See Medina, 485 F.3d at 1297, 1304.  Again, since the development and administration of modern HIV medications, WinRho is considered to be a treatment for an extremely rare condition.  Indeed, according to expert testimony offered by the Government, none of the patients treated at the clinic had platelet counts low enough to be considered medically worthy candidates for WinRho treatments in the first place.  The lowest platelet count noted by Gonzalez for any patient for whom she prepared paperwork was still three times above the count that the expert testified would be appropriate for a WinRho treatment.  And even had the treatment been appropriate for a patient, the frequency and duration of the treatments provided by Gonzalez at St. Jude were medically inappropriate.  According to the uncontroverted medical evidence, WinRho is intended to be administered as a single dose followed by an observation

14

period of three to five days.  But at St. Jude, the medication was allegedly provided to patients three times a week for some five months.  Moreover, Dr. Wohlfeiler testified that anyone working as a nurse at an HIV infusion clinic would receive on-the-job training to understand what she was doing, how she ought to go about doing it, and what risks were presented by various medications and treatments.

Gonzalez argues, nevertheless, that because she was merely a technician working in the clinic, she lacked the expertise to know that the treatments she was providing to the clinic's patients were not medically necessary.  She also says that the evidence against her is substantially weaker than the evidence offered against her co-conspirators Mateos and Dr. Alvarez, whose convictions we affirmed in 2010.  Mateos was actually a nurse and worked with Gonzalez in the St. Jude infusion room.  In affirming Mateos's conviction, a panel of this Court observed that, while "the evidence against [her] was not overwhelming, it was sufficient to support the jury's guilty verdicts."  Mateos, 623 F.3d at 1363.  Gonzalez insists that the evidence against her was far weaker than that which was leveled against Mateos, especially because Gonzalez, unlike Mateos, had no medical training.

But even accepting that Gonzalez's lack of medical training put her in an arguably different position than Nurse Mateos, there was still sufficient evidence from which the jury could find beyond a reasonable doubt that she had knowledge of the conspiracy to commit health care fraud and knowingly joined it.  Among

15

other things, the jury could readily have found that she knowingly participated in a conspiracy to bill for medical services that were not actually delivered to the patients. See Medina, 485 F.3d at 1297. According to the trial testimony, patients never stayed in the infusion room with Gonzalez for longer than 30 minutes. Nevertheless, Gonzalez filled out and repeatedly signed paperwork used for billing purposes indicating that on 618 different occasions, she had provided WinRho treatment that lasted for longer than 30 minutes. Additionally, the clinic billed Medicare for administering 1,809 vials of WinRho. But the records indicated that the clinic only had 610 vials in its inventory, which would not have been even remotely sufficient to provide all of the infusion therapy treatments alleged to have been provided in the claims filed with Medicare. As one of two people in the clinic responsible for administering the medication to patients and informing Perera when more medication should be ordered, the jury had sufficient evidence to infer that Gonzalez was aware of and helped foster this vast discrepancy.

What's more, we repeat again, Gonzalez was personally involved in paying cash kickbacks behind locked doors to each and every patient who was purportedly treated with a WinRho infusion at St. Jude. This arrangement practically screams that something amiss was taking place at the clinic. Gonzalez's lack of formal nursing or medical training would not have affected her ability to recognize the suspicious nature of the activities in which she was engaged. Neither the ability to

16

keep time, nor count accurately, nor to recognize the suspicious nature of a medical care provider making cash payments to each of its patients was dependent upon medical training.

Finally, the jury also was entitled to consider evidence of Gonzalez's pre-trial flight and five years as a fugitive as substantive evidence of her consciousness of guilt of the charged conspiracies.  See United States v. Kennard, 472 F.3d 851, 855 (11th Cir. 2006) (finding no error in permitting jury to consider evidence of defendant's post-indictment flight as being probative of guilt); United States v. Blakey, 960 F.2d 996, 1000 (11th Cir. 1992) ("Evidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt.").  Here, the evidence of Gonzalez's prolonged flight was presented unambiguously to the jury in the form of the factual proffer she signed upon her entry of a plea of guilty to the § 3146 failure-to-appear charge.  In that proffer, Gonzalez admitted that she "knowingly and willfully failed to appear as directed by the Court" and accepted the responsibility for her illegal conduct.

The long and short of it is, the evidence established that Gonzalez played a daily and active role in furthering the unlawful objectives of each conspiracy and was surrounded every day at St. Jude for five months by circumstances that reeked of fraud.  On this record, the jury could find beyond a reasonable doubt, as it

17

undoubtedly did, that Gonzalez knew of and willfully joined the charged conspiracies.  United States v. Cole, 755 F.2d 748, 755 (11th Cir. 1985).

## III.

Gonzalez also argues that the indictment charged her with two separate conspiracy offenses that really were the same offense, thus placing her two convictions and sentences in violation of the Fifth Amendment's Double Jeopardy Clause.  We find no reversible error.

## A.

We note at the outset that Gonzalez only raised her double jeopardy challenge for the first time on appeal, never having presented it to the trial court. The Government argues that, because she did not object to the indictment prior to going to trial, she has waived any double jeopardy challenge to her convictions, although we may still review her dual sentences for plain error.  In light of a recent amendment to the Federal Rules of Criminal Procedure, however, we believe it is appropriate in this case for us to review the double jeopardy challenges to both Gonzalez's convictions and sentences, albeit only for plain error.

We must first resolve whether Gonzalez's failure to raise a double jeopardy objection prior to trial waived or forfeited her right to raise the challenge on appeal.  "Waiver is different from forfeiture.  Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or

abandonment of a known right.' " United States v. Olano, 507 U.S. 725, 733 (1993) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).  If a party waives an argument in the district court, we will not review it on appeal.  See United States v. Pacchioli, 718 F.3d 1294, 1307 (11th Cir. 2013).  But if an argument is forfeited because it had not been timely raised in the district court, we generally will review it for the first time on appeal, but only for plain error.  See Olano, 507 U.S. at 731 (holding that the plain error standard of review applies to "errors that were forfeited because not timely raised in district court").

Under the version of Rule 12 that was in effect at the time of the defendant's trial, Gonzalez was required to raise any non-jurisdictional challenges to her indictment prior to trial, and the failure to do so waived all appellate review.  See Pacchioli, 718 F.3d at 1307.  Under that version of Rule 12, Gonzalez's failure to object to the indictment before trial would have waived any challenge to her convictions as multiplicitous, meaning that she would be barred altogether from raising that challenge on appeal.  Id. at 1308.

But after Gonzalez's trial, Rule 12 was amended to provide that a failure to raise a challenge to an indictment prior to trial results in forfeiture, not waiver, of the challenge.  See United States v. Sperrazza, 804 F.3d 1113, 1118-19 (11th Cir. 2015), cert. denied, 136 S. Ct. 2461 (2016).  The current version of Rule 12 then, which went into effect on December 1, 2014, still provides that a defendant must

19

raise a challenge to an indictment prior to trial.  See Fed. R. Crim. P. 12(b)(3)(B).

But Rule 12 now also provides that the failure to raise a pre-trial challenge to the

indictment only renders the motion "untimely."  See Fed. R. Crim. P. 12(c)(3).

Thus, if the new version of Rule 12 applies to Gonzalez's double jeopardy

challenge, her challenge is forfeited, rather than waived, and we may review it for

plain error.  See Sperrazza, 804 F.3d at 1119.

The Supreme Court's order amending Rule 12 provides that the 2014

amendment " 'shall take effect on December 1, 2014, and shall govern in all

proceedings in criminal cases thereafter commenced and, insofar as just and

practicable, all proceedings then pending.' "  Id. at 1120 (quoting Proposed

Amendments to the Federal Rules of Criminal Procedure, 572 U.S. __ (Apr. 28,

2014)).  Thus, we apply the new version of Rule 12 to Gonzalez's double jeopardy

claim because she still has a pending proceeding (namely, this appeal), neither

party argues that it would be unjust or impractical to apply the new rule, and we

can see no reason not to apply the new rule.  See id. at 1121.  Under the new

version of the rule, then, her challenge is forfeited rather than waived.  See id.

Accordingly, we review for plain error Gonzalez's claim that Counts 1 and 2 of the

indictment and her ensuing sentences are multiplicitous and in violation of the

Double Jeopardy Clause.

We may correct a plain error only when (1) an error has occurred, (2) the error was plain, and (3) the error affected substantial rights.  See United States v. Williams, 527 F.3d 1235, 1240 (11th Cir. 2008).  An error is plain where it is "clear" or "obvious."  Olano, 507 U.S. at 734.  For plain errors, the defendant bears the burden of persuasion that an error affecting substantial rights has occurred.  See id.; United States v. Rodriguez, 398 F.3d 1291, 1299 (11th Cir. 2005).  To establish that an error affected substantial rights, the defendant must show that there is a reasonable probability that the error affected the outcome of the district court proceedings.  Rodriguez, 398 F.3d at 1299.  "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings."  United States v. Cotton, 535 U.S. 625, 631-32 (2002) (quoting Johnson v. United States, 520 U.S. 461, 467 (1997)).  The plain error test is "difficult to meet" and places "a daunting obstacle before the appellant." Rodriguez, 398 F.3d at 1298 (alteration adopted) (quoting United States v. King, 73 F.3d 1564, 1572 (11th Cir. 1996); United States v. Pielago, 135 F.3d 703, 708 (11th Cir. 1998)).  Thus, "[t]he Supreme Court has instructed us that plain error review should be exercised 'sparingly,' and only 'in those circumstances in which a miscarriage of justice would otherwise result.' "  Id. (citation omitted) (quoting Jones v. United States, 527 U.S. 373, 389 (1999); Olano, 507 U.S. at 736).

**B.**

The Double Jeopardy Clause "protects against multiple punishments for the same offense." United States v. Adams, 1 F.3d 1566, 1572 (11th Cir. 1993) (quoting Brown v. Ohio, 432 U.S. 161, 165 (1977)).  An indictment, therefore, violates the Double Jeopardy Clause if it is multiplicitous -- that is, "if it charges a single offense in more than one count." Williams, 527 F.3d at 1241.  We have regularly utilized the test laid out by the Supreme Court in Blockburger v. United States, 284 U.S. 299, 304 (1932), in deciding whether an indictment is multiplicitous.  See Williams, 527 F.3d at 1240; United States v. Hassoun, 476 F.3d 1181, 1185 (11th Cir. 2007); Adams, 1 F.3d at 1574.  Under Blockburger, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304.  Ultimately, "the 'dispositive question' [in the Blockburger analysis is] whether Congress intended to authorize separate punishments for the two crimes." Albernaz v. United States, 450 U.S. 333, 344 (1981) (quoting Whalen v. United States, 445 U.S. 684, 689 (1980)).  Importantly, the Blockburger analysis answers this question by "focus[ing] on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial." Illinois v. Vitale, 447 U.S. 410, 416 (1980).

22

As for the formal charges against Gonzalez, we do not perceive an error --

let alone one that was plain or obvious, affected the defendant's substantial rights,

and undermined the fairness and integrity of the judicial proceedings.  In fact,

contrary to the view argued in her brief, Gonzalez expressly conceded during oral

argument that the two conspiracy statutes for which she was convicted -- 18 U.S.C.

§ 371 and 18 U.S.C. §§ 1347 and 1349 -- each requires proof of a unique element

not required by the other and that, therefore, each offense was textually distinct

from the other under the Blockburger test.  This effectively settles the question

since we are tasked with applying the Blockburger elements analysis.

Looking to the statutes at issue, Gonzalez's concession is correct.  Count 1

charged Gonzalez with a conspiracy to defraud the United States, in violation of 18

U.S.C. § 371.  The statute provides:

> If two or more persons conspire either to commit any
> offense against the United States, or to defraud the
> United States, or any agency thereof in any manner or for
> any purpose, and one or more of such persons do any act
> to effect the object of the conspiracy, each shall be fined
> under this title or imprisoned not more than five years, or
> both.

18 U.S.C. § 371.  Thus, in order to sustain a conviction under § 371, the

Government must prove: (1) an agreement by two or more individuals to commit

an offense against or defraud the United States; (2) knowing and voluntary

participation; and (3) an overt act by a conspirator.  See Hasson, 333 F.3d at 1270.

23

Count 2 charged Gonzalez with a conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.  Section 1349 makes it a crime to conspire to commit an offense under Chapter 63 of Title 18, which includes such offenses as bank fraud, health care fraud, and securities and commodities fraud.  18 U.S.C. § 1349.  To convict a defendant under § 1349, the Government had to establish: (1) a conspiracy to commit an offense proscribed in Chapter 63 of Title 18, which defines various fraud offenses; (2) knowledge of the conspiracy; and (3) that the individual knowingly and voluntarily joined the conspiracy.  See 18 U.S.C. § 1349; Moran, 778 F.3d at 960.  The indictment charged Gonzalez with having conspired to violate 18 U.S.C. § 1347, the health care fraud statute.  That statute, in turn, provides:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice--
>
> > (1) to defraud any health care benefit program; or
> >
> > (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1347(a).  The term "health care benefit program" is defined to include "any public or private plan or contract, affecting commerce, under which any

medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b).

In considering these statutes, it is plain that each requires proof of a unique element not required by the other. Thus, among other things, § 371 requires as elements proof of an overt act and proof that the intended victim was the United States or one of its agencies. In contrast, the language of § 1349 does not require the commission of an overt act. Nor, does it require that the United States or one of its agencies be the intended victim of the fraud. Indeed, conspiring to commit health care fraud under §§ 1347 and 1349 (as the defendant here was convicted of doing) can encompass targeting either a public or a private plan that provides medical benefits. This explains why our sister circuits have held that the requirements of § 1347 have been satisfied even when the fraud targeted private insurers. See United States v. Collins, 774 F.3d 256, 260 (5th Cir. 2014), cert. denied, 135 S. Ct. 2391, 136 S. Ct. 260 (2015) (holding that automobile insurers are "health care benefit programs" to the extent they pay for medical treatment); United States v. Lucien, 347 F.3d 45, 52 (2d Cir. 2003) (same). Likewise, § 1349 requires that the conspiracy must relate to one of a specific subset of statutes found in Chapter 63 of Title 18. But § 371 explicitly applies to conspiracies to commit any offense against the United States or to defraud the United States. Thus, a

25

conviction under § 371 would not require proof that the conspiracy was for the purpose of committing one of the offenses required by § 1349.  Section 371 simply lacks that element.

Moreover, the statutory text further evinces a Congressional intent to allow for separate and distinct punishment for each of the two conspiracies under which Gonzalez was convicted and sentenced.  Thus, for example, the two statutes provide for different maximum punishments -- five years for a § 371 conspiracy and 10 years for a § 1347 conspiracy.  See United States v. Lanier, 920 F.2d 887, 892 (11th Cir. 1991) (considering differences in maximum punishment and statutory language under each conspiracy statute in assessing congressional intent in multiplicity analysis).  Finally, a panel of this Court has already held that the overt act required by § 371 sufficiently distinguishes a violation of that statute from another similar statute prohibiting conspiracy to defraud the United States, but that lacks the overt act requirement.  Id. at 897.  Accordingly, we are constrained to find, as Gonzalez now concedes, that there was no double jeopardy error in charging Gonzalez under both § 371 and § 1349.

Even if we could say that the charges in Counts 1 and 2 were multiplicitous, in the face of Blockburger and the development of our caselaw, such an error could hardly be described as being plain or obvious.  It is not surprising, therefore, that Gonzalez has conceded that there was no charging error, let alone one that was

plain or obvious. The appellant's double jeopardy argument, however, is reprised

by Gonzalez who suggests that the district court's erroneous jury instructions about

the meaning of the two counts illuminates the true nature of the double jeopardy

claim. We remain unpersuaded about this argument as well for the reasons we

detail in Section IV, particularly because we are obliged to review this issue for

plain error.

## IV.

In addition to her erroneous jury instructions claim, Gonzalez raises several

other claims of trial error, which she says warrant reversal when taken in concert.

Gonzalez lists five alleged trial errors in her brief: erroneous jury instructions;

admission of a plea proffer from another prosecution; admission of prejudicial

hearsay evidence; use of a general verdict form; and improper prosecutorial

arguments to the jury. However, her brief only discusses three of the five issues:

erroneous jury instructions, admission of hearsay, and improper arguments to the

jury. Accordingly, she has abandoned her claims regarding the other two alleged

errors (relating to the plea proffer and the use of a general verdict form). See

Timson v. Sampson, 518 F.3d 870, 874 (11th Cir. 2008) (stating that issues not

briefed are deemed abandoned). As for Gonzalez's remaining claims, we note that

"[e]videntiary and other nonconstitutional errors do not constitute grounds for

reversal unless there is a reasonable likelihood that they affected the defendant's

substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." United States v. Arbolaez, 450 F.3d 1283, 1290 (11th Cir. 2006) (quoting United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir. 1990)).

## A.

Gonzalez says that the district court's jury charge erred in two ways: first, because the instructions improperly ran the two counts together so that the jury could believe that a finding of guilt for one necessarily required a finding of guilt for the other; and second, because the instructions failed to give a definition of the word "kickback." Despite being given the opportunity to do so, Gonzalez failed to object to the jury instructions at trial, either before they were given or after. Thus, we must review the instructions only for plain error, see United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000), and Gonzalez has not carried her burden under that exacting standard.

The first problem Gonzalez faces is that it is not at all clear that erroneous jury instructions, even those that erroneously conflate two statutes implicate the Double Jeopardy Clause. Thus, while jury instructions that erroneously conflate two counts of an indictment or erroneously indicate that the verdict on one count necessarily controls the verdict on the other may amount to fatal error, the error cannot be grounded on the Double Jeopardy Clause. Again, our precedent makes

28

clear, "when comparing charges under different statutory provisions . . . we examine only the elements themselves; if an offense requires proof of an element that the other offense does not, we need look no further in determining that the prosecution of both offenses does not offend the Fifth Amendment." Hassoun, 476 F.3d at 1186. Thus, "we need not examine the facts alleged in the indictment to support the counts nor the 'practical significance' of the theories alleged for each count." Id. (quoting Lanier, 920 F.2d at 894). Nor do we look to the jury instructions given by the trial court. United States v. Dowd, 451 F.3d 1244, 1252-53 (11th Cir. 2006) (noting in denial of double jeopardy claim that defendant erred "by focusing solely on the particular charges in his indictment and the jury instructions offered in his trial" rather than the statutory elements of the offenses); accord Adams, 1 F.3d at 1574 ("We hold that in consecutive prosecution double jeopardy analysis, the Blockburger test is to be applied to the statutory elements underlying each indictment, or count, not to the averments that go beyond the statutory elements."). Indeed, we are not aware of any decision in this Circuit or any other in which a court has held that erroneous jury instructions can create a double jeopardy violation when the statutes charged in the indictment each contain an element that the other does not. See United States v. Honarvar, 477 F.3d 999, 1002 (8th Cir. 2007) (rejecting defendant's "novel" argument that jury instructions violated the Double Jeopardy Clause); United States v. Tashjian, 660 F.2d 829,

844 (1st Cir. 1981) ("Under the Double Jeopardy Clause, if each of the statutes at issue requires proof of a fact which the other does not, . . . then one is not included within the other and the Clause does not bar convictions on both counts, regardless of how the statutes were defined by the trial court." (quotation marks and citations omitted)).  Rather, we apply a "strictly elemental analysis" that focuses on the statutes charged, not the way they were presented in the district court.  Hassoun, 476 F.3d at 1186.

Thus, we examine the claimed errors in the jury instructions under our traditional framework.  We begin with the often-noted comment that we will reverse a conviction due to an erroneous jury instruction only when "the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process."  United States v. Williams, 526 F.3d 1312, 1320 (11th Cir. 2008) (quoting Prather, 205 F.3d at 1270).  District courts have wide discretion in the style and phrasing of instructions.  Id.  When a jury instruction accurately expresses the applicable law, "there is no reason for reversal even though isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism."  United States v. Gibson, 708 F.3d 1256, 1275 (11th Cir. 2013) (quoting United States v. Beasley, 72 F.3d 1518, 1525 (11th Cir. 1996)).  Indeed, the Supreme Court has directed us that "instructions must be

evaluated not in isolation but in the context of the entire charge." Jones, 527 U.S. at 391.

Because we must consider jury instructions in the context of the entire charge -- and here only for plain error -- we reproduce those instructions at some length. In explaining the indictment to the jury, the district court began by giving a brief overview of the two counts against Gonzalez:

> Count 1 charges that the defendant knowingly and willfully committed the crime of conspiracy. Specifically that around April 2003 through November 2003, the defendant knowingly and willfully conspired to defraud the United States to cause the submission of false claims and to pay healthcare kickbacks.
>
> Count 2 also charges a conspiracy, but it's a separate conspiracy. It charges that the defendant knowingly and willfully conspired or agreed with others to defraud a healthcare benefit program by submitting false claims to the United States.

Notably, the judge highlighted the fact that the two charges related to separate conspiracies.

After defining for the jury what a conspiracy requires, the district court went on to explain the elements of the § 371 conspiracy charged in Count 1:

> The defendant can be found guilty of this crime, the first conspiracy, only if all of the following facts are proved beyond a reasonable doubt: First, two or more persons in some way agreed to try to accomplish the shared and unlawful plan. Two, the defendant knew the unlawful purpose of the plan and willfully joined in it. And three, during the conspiracy, one of the conspirators knowingly

31

engaged in at least one overt act as described in the Indictment, and the indictment would list the overt acts. And fourth, the overt act was committed around the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

The court then instructed the jury regarding each of the three objects of the conspiracy as alleged in the indictment: defrauding the United States, submitting false claims to the Department of Health and Human Services, and paying kickbacks or bribes to Medicare beneficiaries.  It further informed the jurors that "to return a verdict of guilty, you must all agree on which of the crimes, which of the objects the defendant conspired to commit."  The district court accurately identified the elements of the § 371 conspiracy, and explained the three objects of the conspiracy as alleged in the indictment.

Regarding the conspiracy to commit Medicare fraud charged in Count 2, the court explained:

> But Count 2 charges conspiracy to commit healthcare fraud and that differs in an important respect from the first charge, which charges conspiracy to defraud the United States, to cause the submission of false claims to the United States and to pay healthcare kickbacks.
>
> Unlike that Count 1, Count 2, the second charge, the Government does not have to establish what we call overt acts the way I explained it.  In other words, the prosecutor does not have to prove that any conspirator took any particular step or committed any overt act to carry out the conspiracy.  And it's easier to understand when you see the Indictment.

One conspiracy count will have a list of overt acts and the Government has to prove one overt act committed by someone who's a co-conspirator in furtherance of the conspiracy. The second count of the conspiracy, the Government still has to prove what we call the elements, but no overt acts need to be proven. That's why there are two charges in this case.

The evidence in the case for the Count 2, the second conspiracy alleged, must prove -- what the Government has to prove beyond a reasonable doubt is first, that two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the Indictment, and second, that the defendant knowing the unlawful purpose of the plan willfully joined in it.

The healthcare fraud statute makes it a federal offense for anyone in connection with the delivery of any healthcare benefit item or service to knowingly and willfully execute or attempt to execute a scheme or artifice, to defraud any healthcare benefit program or to obtain by means of materially false or fraudulent pretenses, representations or promises any of the money or property owned by or under the custody or control of any healthcare benefit program.

There are two means by which the healthcare fraud statute may be violated. First, by executing a scheme or artifice to defraud a healthcare benefit program, or second, by executing a scheme or artifice to make materially false pretenses, representations, statements or promises in order to obtain money or property from a healthcare benefit program.

The Indictment in this case charges that the defendant conspired to do both. You may find the defendant guilty of this conspiracy if you conclude beyond a reasonable doubt that the defendant conspired to violate the statute by either of these two means -- kind of similar to the

33

> objects of the conspiracy that I mentioned before --
> provided that you unanimously agree on which means.
> So it's kind of like the same thing.  The Government
> charges two different ways of conspiring to commit
> healthcare fraud, all of you have to agree on which way.
> The Government doesn't have to prove both, but you all
> have to agree on which of the two or both the
> Government has proven beyond a reasonable doubt.

Thus, the district court correctly identified the elements of a conspiracy under

§ 1349, as well as the elements of the underlying health care fraud statute, § 1347.

The court correctly identified the unique element required by each count,

explaining that the Government had to prove an overt act and the jury had to

unanimously agree on one of the three objects alleged in the indictment to convict

Gonzalez under Count 1, and that the Government had to prove that the object of

the conspiracy was health care fraud to convict Gonzalez under Count 2.  But

Gonzalez points to two phrases in the instruction to argue that the instruction

suggested that the only difference between the two counts was that Count 1

required the Government to prove an overt act.  First, the district court stated that

the reason there were two charges in this case was because the Government does

not have to prove an overt act in Count 2, but does in Count 1.  Then, later in the

instruction, the court stated that the object of the conspiracy in Count 2, health care

fraud, was "kind of similar to the objects of the conspiracy" in Count 1.

Even if we were to accept that the two isolated phrases Gonzalez highlights

may have been confusing, we do not believe it is obvious or plain that the

34

instructions when taken as a whole inaccurately conveyed the law, or that, even if they did, her substantial rights were affected.  Considering the instructions taken as a whole, the district court explained the elements of each conspiracy charge, including the differing objects of each conspiracy.  Moreover, the court gave the jury a copy of the indictment during deliberations and instructed the jury that the difference between the two counts would be "easier to understand when you see the Indictment."  The indictment made clear that the only object of the conspiracy charged in Count 2 was health care fraud, while separately delineating three possible objects of the conspiracy charged in Count 1.  The jury would, therefore, have understood that a conviction under Count 1 would not require a conviction under Count 2 because the two counts charged violations of materially distinct statutes that could be violated through the pursuit of different objects.  Thus, "any doubt left by the instruction was cured when the jury took with it a copy of the indictment during deliberations."  See Vernon, 723 F.3d at 1263.  The limited phrases Gonzalez now highlights on appeal may have been imperfect, but, taking those phrases in the context of the jury instructions in their entirety, they did not clearly obviate the remainder of the instructions that accurately conveyed the relevant law, including the pertinent distinctions between the counts of the indictment.  Thus, even to the extent there may have been error, it was not clear or obvious.

35

But, in any event, even if we assume that Gonzalez has met her burden of establishing the first two prongs of the plain error test, she has failed to carry her burden of establishing the third requirement -- that the claimed errors affected her substantial rights -- let alone that the errors affected the fairness, integrity, or public reputation of the proceeding. See Cotton, 535 U.S. at 631. She has made no showing (nor has she even so much as offered the argument) that, had the district court instructed the jury as to the two counts with the clarity she now urges, there is a reasonable probability that the jury's verdict would have been any different. See Rodriguez, 398 F.3d at 1299. Nor can we discern any likelihood of a different outcome having examined this record at length for the reasons we have already explained. There was more than ample evidence to support Gonzalez's convictions for violating each of the conspiracy statutes. Gonzalez has simply not established a reasonable probability that this claimed jury instruction error affected the outcome of the district court's proceedings. Nor has she even suggested, let alone raised, any argument that the jury instructions undermined the fairness and integrity of the entire judicial proceeding. See Cotton, 535 U.S. at 631.

Gonzalez raises a second argument concerning the district court's jury instructions. She claims that the district court also plainly erred by failing to instruct the jury on the elements required to prove a violation of the federal anti-kickback statute, which was one of the objects of the conspiracy alleged in

36

Count 1. She insists that this omission further blurred the distinction between the two counts. But the district court's failure to spell out the meaning of the term "kickback" was not a clear or obvious error. The district court did instruct the jury that "the third charged object of the conspiracy [in Count 1] is to pay kickbacks and bribes to Medicare beneficiaries in violation of another federal law," and instructed the jury that Medicare is a federal health care program.

It is by now "well settled that a court need not define terms that are not unduly technical or ambiguous or that are within the common understanding of the jury." United States v. Smith, 459 F.3d 1276, 1297-98 (11th Cir. 2006) (quoting United States v. Pepe, 747 F.2d 632, 674 n.78 (11th Cir. 1984)). Furthermore, "in reviewing jury instructions, our task is also to view the charge itself as part of the whole trial." United States v. Park, 421 U.S. 658, 674 (1975). The term "kickback" has a common meaning that would have been readily understood by the jury in this case and would correspond to the statutory definition of the term, especially here where the Government's witnesses testified that Gonzalez paid hundreds of Medicare patients large sums of cash to come to the clinic to receive services for which the clinic would be paid by Medicare. Merriam-Webster's Third New International Dictionary (2002) defines "kickback" as, among other things, "a usu[ally] secret rebate of part of a purchase price by the seller to the buyer or to the one who directed or influenced the purchaser to buy from such

37

seller." This definition is consistent with the statue's prohibition of any payment to a person "to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B). Moreover, the indictment essentially quoted the entire relevant portion of the anti-kickback statute. The lack of an oral instruction defining "kickback" did not amount to error, let alone plain error. Nor, again, did it affect Gonzalez's substantial rights or the fairness and integrity of the judicial proceedings.

**B.**

Next, Gonzalez argues that the district court erroneously permitted the introduction of hearsay testimony from co-conspirator Rodriguez, who testified that Gonzalez's father was the uncle of the Benitez brothers. Notably, however, Gonzalez offered no objection when the same testimony was introduced by co-conspirator Perera. Having abandoned any challenge to the admission of Perera's testimony, see United States v. Ford, 270 F.3d 1346, 1347 (11th Cir. 2001), Gonzalez could not have been prejudiced, let alone substantially prejudiced, by Rodriguez's testimony to the same effect. Quite simply, any possible error in admitting Rodriguez's testimony would be harmless. See Arbolaez, 450 F.3d at

1291 (finding erroneous admission of witness's hearsay statement harmless because it could not have had "substantial influence" on jury's verdict).[2]

## C.

Gonzalez also cites as a trial error that during the Government's rebuttal argument in closing the prosecutor improperly stated: "And ask yourself this; why is it that we're now here five years later instead of this case being tried five years ago?  Because the defendant chose to flee."  Gonzalez insists that this statement constituted improper witness vouching, as the Government was suggesting that any faults in the witnesses' memories were due to the fact that the trial was delayed because of Gonzalez's five years as a fugitive.  She contends that the Government relied on facts not in evidence when it stated that she had been a fugitive for five years.

"To find prosecutorial misconduct, a two-element test must be met: '(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant.' "  United States v. Reeves, 742 F.3d 487, 505 (11th Cir. 2014) (quoting United States v. Gonzalez, 122 F.3d 1383, 1389 (11th Cir. 1997)).  A prosecutor commits improper vouching by "arguing credibility based . . . on evidence not before the jury," United States v. Eyster, 948 F.2d 1196,

---

[2] Because any error in admitting Rodriguez's testimony was clearly harmless, we need not address whether admitting her testimony was error in the first place.

1207 (11th Cir. 1991) (quotation omitted), or by placing "the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity," United States v. Epps, 613 F.3d 1093, 1100 (11th Cir. 2010) (quotation omitted).  We have explained that "[i]mplying the existence of additional evidence not formally before the jury severely impairs the likelihood of a fair trial."  Eyster, 948 F.2d at 1207.  At the same time, "[i]t has long been held that a prosecutor may argue both facts in evidence and reasonable inferences from those facts."  Tucker v. Kemp, 762 F.2d 1496, 1506 (11th Cir. 1985) (en banc).

The Government's reference to Gonzalez's time as a fugitive was not improper.  Evidence of Gonzalez's flight before trial was amply presented to the jury by a witness who read into evidence Gonzalez's factual proffer taken from the failure-to-appear charge.  The proffer, which is dated October 16, 2013, stated that Gonzalez "knowingly and willfully failed to appear" before the district court in connection with this case in June 2008.  Given the five-year gap between Gonzalez's failure to appear and the date of her factual proffer, it was reasonable to infer that she had fled for five years.  The Government's statements only elucidated a reasonable inference that the jury was free to draw from the evidence, and did not reach impermissibly beyond this record.  Moreover, the prosecutor's statement was made in direct response to extensive cross examination by defense counsel regarding inconsistencies in a witness's testimony, a point defense counsel

40

also argued in closing arguments. Nowhere did the Government make a personal assurance of the witness's veracity or suggest the existence of evidence that had not been squarely presented to the jury. Simply put, the Government did not improperly vouch for any witness's credibility.

### D.

Finally, Gonzalez urges that the cumulative effect of the purported trial errors warrant reversal. "Under the cumulative-error doctrine, we will reverse a conviction where an aggregation of non-reversible errors yields a denial of the constitutional right to a fair trial." Reeves, 742 F.3d at 505. But the jury instructions were not plainly erroneous, the prosecutor's remark was not error at all, and the admission of Rodriguez's testimony was, at most, a single, plainly harmless error. Taken as a whole, this is insufficient to support a cumulative error argument. See United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011) (noting that if there are no errors or "only a single error, there can be no cumulative error").

Accordingly, we affirm Gonzalez's convictions and sentences.

**AFFIRMED.**