[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13443

_____

D.C. Docket No. 1:11-cr-20279-RNS-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ISAAC FELDMAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 30, 2019)

Before WILLIAM PRYOR, NEWSOM, and BRANCH, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

This appeal requires us to decide several issues—including an issue of first

impression in this Circuit about the Double Jeopardy Clause of the Fifth

Amendment—arising from Isaac Feldman's convictions and sentence for

conspiracy to commit wire fraud and conspiracy to commit money laundering. Feldman invested in two Miami Beach nightclubs that hired foreign women to pose as tourists, attract patrons, and persuade them to buy drinks without paying attention to the clubs' exorbitant prices. A grand jury returned an indictment against Feldman and alleged co-conspirators alleging that the nightclubs' activities included regular acts of wire fraud. After a jury convicted the defendants of some counts but acquitted them of others, we reversed their convictions. *See United States v. Takhalov*, 827 F.3d 1307 (11th Cir.), *modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016). After a retrial, a second jury found Feldman guilty of conspiracy to commit wire fraud and conspiracy to commit money laundering. The district court sentenced him to 100 months of imprisonment. Feldman contends that his retrial on an alternate theory of the money-laundering-conspiracy charge—for which the first jury verdict was silent—violated his double-jeopardy rights, that the evidence is insufficient to support his convictions, that the indictment's wire-fraud-conspiracy charge was constructively amended, that literary allusions by prosecutors deprived him of a fair trial, and that his sentence is procedurally and substantively unreasonable. We disagree on each point, and we affirm his convictions and sentence.

2

## I. BACKGROUND

A grand jury indicted Isaac Feldman and several alleged co-conspirators for one count of conspiracy to commit wire fraud, 18 U.S.C. §§ 1343, 1349; one count of conspiracy to commit money laundering, *id.* § 1956(h), both by means of financial transactions to conceal the nature and source of illegal proceeds, *id.* § 1956(a)(1)(B)(i), and by the international transmission of funds to promote unlawful activity, *id.* § 1956(a)(2)(A); and several counts of wire fraud, *id.* § 1343. The charges stemmed from the defendants' involvement in a ring of Miami Beach nightclubs at which customers were parted from their money. The ringleader of the alleged conspiracy was Russian businessman and con artist Alec Simchuk, who became a cooperating witness for the government. Feldman, a Miami Beach–area resident and Russian-speaking naturalized citizen, invested in two clubs with Simchuk, Stars Lounge and VIP Diamond Club.

The clubs operated on a business model that Simchuk had developed in Eastern Europe. The basic hustle was for so-called "B-girls," young women from Eastern Europe who worked for the clubs, to pose as partygoing tourists, trawl Miami Beach for eligible patrons—the ideal targets were well-dressed single men using high-value credit cards—and lure them back to the clubs, where they would be led to spend exorbitant sums on drinks for themselves and the B-girls. The indictment charged a panoply of deceptive or underhanded tactics that the B-girls

3

and bartenders used to increase the customers' bills and to keep them unaware of the charges they were incurring: for example, hiding menus, ordering drinks without the customers' knowledge, ignoring customers' inquiries about prices, lying about prices, hiding the amount on a receipt when requesting a customer's signature, forging customers' signatures, encouraging customers to drink themselves into a stupor, and serving the B-girls shot glasses filled with water when the customers thought they were ordering vodka shots.

Feldman and several alleged co-conspirators pleaded not guilty, and after a joint trial, a jury found Feldman guilty of conspiracy to commit wire fraud. But the jury found Feldman not guilty of the individual counts of wire fraud with which he was charged. The jury also found Feldman guilty of conspiracy to commit money laundering by the international transmission of funds to promote unlawful activity, 18 U.S.C. § 1956(a)(2)(A), but it expressed no finding about conspiracy to commit money laundering by financial transactions to conceal the nature and source of illegal proceeds, *id.* § 1956(a)(1)(B)(i).

The verdict form provided the jury three options with regard to the money-laundering-conspiracy count: "Guilty (Concealment of Payments)," "Guilty (Transmitting & Receiving Funds Internationally)," and "Not Guilty," arranged as follows:

4

8.    We, the Jury, unanimously find Defendant ISAAC FELDMAN, as charged in Count 29 of the Indictment:

GUILTY _____
(Concealment of Payments)

NOT GUILTY _____

GUILTY __✗__
(Transmitting & Receiving
Funds Internationally)

The district court instructed the jury that it could find Feldman guilty under either or both theories, but it had to agree unanimously about any theory it selected. The jury found Feldman guilty of conspiracy to commit money laundering by international transactions and made no other mark, as the image above reflects.

The district court sentenced Feldman to 100 months of imprisonment, which exceeded Feldman's advisory guideline range. The district court determined that an upward variance was warranted based in large part on its finding that Feldman had committed perjury when he testified in his defense.

We reversed Feldman's convictions on the ground that the district court erred when it failed to give a jury instruction requested by the defendants. *See Takhalov*, 827 F.3d at 1312–24. The requested instruction would have informed the jury that the B-girls' concealment of their employment relationship with the clubs was not sufficient to establish fraud. *See id.* at 1311. We held that the district court should have given the requested instruction because it correctly stated the

5

law, dealt with an important matter raised at the trial, and was not substantially covered by the other instructions. *See id.* at 1315–20. And we held that its denial was not harmless beyond a reasonable doubt because the government had argued that the B-girls' dissembling their employment status was in and of itself an act of fraud, and the jury reasonably could have found that the defendants lacked any other fraudulent intent. *See id.* at 1322–25.

The government redacted the indictment to charge Feldman individually with the wire-fraud and money-laundering conspiracy counts of which the first jury had found him guilty. Feldman again pleaded not guilty, and he proceeded to an individual trial.

At the second trial, the gist of the government's case was that Feldman was an involved investor with significant managerial authority over the clubs' activities and finances. Simchuk, the most important government witness, testified about the clubs' business model, the manner in which the B-girls and bartenders fleeced customers out of their money, and Feldman's knowing participation in the scheme. Several B-girls testified about incidents in the clubs and the extent of their interactions with Feldman. And the government presented evidence that Feldman helped manage the clubs' finances through his sister, Alex Burrlader, and his accountant, Kim Marks. Burrlader, who worked as Feldman's bookkeeper, was a signatory of the Stars Lounge bank account and kept records of the clubs' finances

6

in her office at Feldman's realty company, including records of "chargebacks," or payments that credit-card companies rescinded after their customers complained that the nightclubs had billed them for unauthorized charges. Marks testified that he had set up a limited-liability company, Ieva Marketing LLC, in the name of B-girl Ieva Koncilo at either Feldman's or Burrlader's request; Simchuk testified that Feldman had managed the creation of the company and that its purpose was to funnel cash payments to the B-girls without having to pay taxes on their earnings.

Feldman did not testify in his own defense as he had at the first trial. He presented a short character-based defense by calling two business associates and his rabbi to testify that he was a naïve and trusting person who would not willingly have joined a fraudulent scheme. Apart from their testimony, Feldman's defense strategy was to try to establish on cross-examination of the government's witnesses that Feldman had no knowledge of any fraud that took place in the nightclubs and that Simchuk's testimony to the contrary was unreliable.

On two occasions, prosecutors made references to the Charles Dickens novel *Oliver Twist* and, in particular, the character Fagin, a street criminal who inducted the title character into his band of juvenile pickpockets. During jury selection, the government used Fagin and the children as an example when it asked prospective jurors whether they understood that the ringleader of a conspiracy is guilty of a crime even if he does not personally steal from the targets and whether they would

7

be unwilling to credit a co-conspirator's testimony because he was also a criminal.
The government returned to the image of Fagin during its rebuttal closing argument:

> I will end with the story of where we began with my colleague . . . . He talked about the story of *Oliver Twist* and how the older man, Fag[i]n, would send out his little orphans onto the street to pick people's pockets. Those guys—Fag[i]n wasn't there on the streets picking their pockets. Oleg Simchuk, Isaac Feldman, weren't there when these credit cards were being processed. But did they know it? Did they benefit from it? Absolutely.

Because much of the evidence at the second trial concerned the B-girls' efforts to induce customers to drink to excess, the district court's instructions to the jury included the following paragraph to distinguish between fraudulent and innocent conduct:

> The law does not excuse a patron from his obligation to pay for beverages or goods just because he became intoxicated voluntarily. Even if the establishment uses attractive women to encourage a patron to purchase and consume increasing amounts of alcoholic beverages, the patron is not a victim of fraud when he becomes intoxicated voluntarily and later regrets the purchases. *But if the establishment forces the patron to consume the alcoholic beverage, or adulterates the beverage, or allows or encourages the patron to become intoxicated with the intent to charge his credit card for purchases he either is unaware of or is too intoxicated to consent to, then such conduct may constitute fraud* [emphasis added].

This instruction was written in part by Feldman's attorney and in part by the district court. At the charge conference, Feldman's counsel asked the district court to give the first part of the instruction. The district court agreed to do so but *sua*

8

*sponte* proposed adding the emphasized sentence. Feldman's counsel asked the district court to read the sentence again, the district court did so, and Feldman's attorney said, "All right. I have been overruled by my esteemed colleagues at the defense table and that's fine."

The jury found Feldman guilty of both conspiracy counts, including both money-laundering objects. Using the 2016 edition of the United States Sentencing Guidelines, the district court calculated that Feldman's advisory guideline range was 46 to 57 months of imprisonment based on a total offense level of 23 and a criminal-history category of I. The district court's calculations included an eight-level enhancement based on a loss amount greater than $95,000 but not greater than $150,000, *see* United States Sentencing Guidelines Manual § 2B1.1(b)(1)(E) (Nov. 2016); a two-level enhancement based on a finding that the fraud involved ten or more victims, *see id.* § 2B1.1(b)(2)(A)(i); a two-level obstruction-of-justice enhancement based on the finding that Feldman committed perjury when he testified at the first trial, *see id.* § 3C1.1; and a two-level enhancement for "sophisticated" money laundering based on the use of Ieva Marketing as a shell entity, *see id.* § 2S1.1(b)(3).

Despite Feldman's lower advisory guideline range, the district court again sentenced Feldman to 100 months of imprisonment. The district court explained its view that "a very significant sentence [was] appropriate in light of the scope of this

9

conspiracy, the significant harm that this crime caused to [the] community and the customers and [the local] tourist industry." It also explained its continued belief that Feldman had committed perjury when he testified at the trial, and it remarked that Feldman "ha[d]n't shown any remorse."

## II. STANDARD OF REVIEW

Three standards govern our review of this appeal. First, we review *de novo* an alleged violation of the Double Jeopardy Clause, *United States v. Strickland*, 261 F.3d 1271, 1273 (11th Cir. 2001); the sufficiency of the evidence, *United States v. Calhoon*, 97 F.3d 518, 523 (11th Cir. 1996); an alleged constructive amendment of the indictment, *United States v. Sanders*, 668 F.3d 1298, 1309 n.9 (11th Cir. 2012); and allegations of prosecutorial misconduct, *United States v. Noriega*, 117 F.3d 1206, 1218 (11th Cir. 1997).

Second, we review alleged errors to which no objection was made at trial only for plain error. *See United States v. Gonzalez*, 834 F.3d 1206, 1217 (11th Cir. 2016). "To establish plain error, 'there must be an error that has not been intentionally relinquished or abandoned'; 'the error must be plain—that is to say, clear or obvious'; and 'the error must have affected the defendant's substantial rights,'" which ordinarily requires "'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *United States v. Corbett*, 921 F.3d 1032, 1037 (11th Cir. 2019) (alteration adopted) (quoting

10

*Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016)). "If these conditions are met, we 'should exercise our discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (alterations adopted) (quoting *Molina-Martinez*, 136 S. Ct. at 1343).

Third, "[w]e review the reasonableness of a sentence for abuse of discretion using a two-step process." *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014) (quoting *United States v. Turner*, 626 F.3d 566, 573 (11th Cir. 2010)). In the first step, "we look at whether the district court committed any significant procedural error, such as miscalculating the advisory guidelines range, treating the guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* In the second step, "we examine whether the sentence is substantively unreasonable under the totality of the circumstances and in light of the § 3553(a) factors." *Id.* We review the district court's legal interpretation of the Sentencing Guidelines *de novo*. *Id.*

### III. DISCUSSION

We divide our discussion in five parts. First, we reject Feldman's argument that double jeopardy barred the concealment-based theory of conspiracy to commit money laundering. Second, we explain that the evidence is sufficient to support

11

Feldman's convictions. Third, we explain that the wire-fraud-conspiracy count of the indictment was not constructively amended. Fourth, we reject Feldman's argument that the allusions by prosecutors to the character of Fagin from *Oliver Twist* deprived him of due process. Fifth, we explain that Feldman's 100-month sentence is procedurally and substantively reasonable.

### A.  Double Jeopardy Did Not Bar the Concealment-Based Money-Laundering Theory.

Feldman contends that he was twice put in jeopardy for conspiracy to commit concealment money laundering because the jury at his first trial did not find that he was guilty under that theory of the money-laundering-conspiracy charge. The Double Jeopardy Clause of the Fifth Amendment guarantees that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "[B]y its terms," the protection of the clause "applies only if there has been some event, such as an acquittal, which terminates the original jeopardy." *Richardson v. United States*, 468 U.S. 317, 325 (1984).

We have held that when a single count charges two different theories of the offense, a jury's finding that the defendant is not guilty under one theory does not bar retrial under the other theory if the jury fails to reach a verdict about the alternative theory and a mistrial results. *See United States v. Rivera*, 77 F.3d 1348, 1350–52 (11th Cir. 1996). But Feldman's first jury did not find him not guilty of conspiracy to commit concealment money laundering. Instead, it found him guilty

12

of conspiracy to commit money laundering by international transactions, and it expressed no finding at all about the concealment theory. So *Rivera* does not squarely control this appeal.

Feldman's argument resembles the objection made in *Green v. United States*, 355 U.S. 184 (1957). Green was charged with one count of first-degree felony murder, and the trial court instructed the jury that it could convict him of second-degree malice murder as a lesser included offense. *See id.* at 185–86. The jury found Green guilty of second-degree murder, but its verdict was "silent" with respect to the first-degree charge. *Id.* at 186. After his second-degree-murder conviction was reversed based on the insufficiency of the evidence, he was retried under the original indictment and convicted of first-degree felony murder. *See id.* Green argued that his conviction violated the Double Jeopardy Clause.

The Supreme Court held that Green's retrial on the first-degree charge violated the prohibition against double jeopardy in two ways. *See id.* at 190; *see also Price v. Georgia*, 398 U.S. 323, 328–29 (1970) (discussing *Green*'s two independent rationales). First, the Court held that it could be "assum[ed]" that the first jury had impliedly "acquitted Green of murder in the first degree" because it had convicted him of the second-degree charge instead. *Green*, 355 U.S. at 190–91. Second, the Court held that "the result . . . need not rest alone on th[at]

13

assumption" because "the jury was dismissed without returning any express verdict on [the first-degree murder] charge and without Green's consent." *Id.* at 190–91.

Despite a superficial resemblance between this appeal and *Green*—namely, that Feldman was found guilty of only one part of a complex count by a jury that remained silent about another part and was later dismissed—a closer examination reveals that neither of its holdings applies to Feldman. The original jury did not impliedly acquit Feldman of any offense when it found him guilty of the only crime charged in the relevant count, conspiracy to commit money laundering, under one of two possible theories of liability. Nor did the dismissal of Feldman's jury before it had "return[ed] any express verdict" on the concealment theory, *id.*, terminate his jeopardy for any offense because Feldman impliedly consented to the jury's dismissal.

The implied-acquittal reasoning that underlies the first holding of *Green* is subject to two conditions not satisfied in this appeal. First, the Court explained that it is "vital" that the two crimes be "distinct and different offense[s]," *id.* at 194 n.14, and we join the many federal and state courts that have declined to infer a partial acquittal "[w]hen a defendant is convicted based on one of two [or more] alternative means of committing a *single* crime," *State v. Ben*, 2015-NMCA-118, ¶ 12, 362 P.3d 180, 183 (emphasis added) (collecting decisions); *see also, e.g.*, *United States ex rel. Jackson v. Follette*, 462 F.2d 1041, 1045–50 (2d Cir. 1972);

14

*State v. Kent*, 678 S.E.2d 26, 33 (W. Va. 2009); *State v. Pexa*, 574 N.W.2d 344, 347 (Iowa 1998). Second, we also agree with the courts that "have refused to imply an acquittal unless a conviction of one crime logically excludes guilt of another crime." *Commonwealth v. Carlino*, 865 N.E.2d 767, 774 (Mass. 2007); *see also, e.g.*, *United States v. Ham*, 58 F.3d 78, 85–86 (4th Cir. 1995); *Kennedy v. Washington*, 986 F.2d 1129, 1134 (7th Cir. 1993); *State v. Terwilliger*, 104 A.3d 638, 668 (Conn. 2014); *State v. Torrez*, 2013-NMSC-034, 305 P.3d 944, 948. This limiting principle follows from the very concept of an *implied* acquittal; if a defendant's conviction for one offense is equally consistent with both guilt and innocence of another, then it cannot accurately be said to "imply" anything. The Supreme Court agreed with this logic in *Cichos v. Indiana*, 385 U.S. 76 (1966), which dismissed the writ of certiorari as improvidently granted and quoted approvingly the opinion of the Supreme Court of Indiana that "the principle which states silence is equal to an acquittal" was "inappropriate" when a guilty verdict on one charge did not "logically exclude" a guilty verdict on another charge. *Id.* at 80 (quoting *Cichos v. State*, 208 N.E.2d 685, 688–69 (Ind. 1965)).

Feldman's retrial did not violate the first holding of *Green* because the indictment did not charge Feldman with two distinct money-laundering-conspiracies. It instead charged him with a *single* conspiracy to commit money laundering either by concealment or by international transactions. No matter which

15

underlying offense the jury found Feldman had conspired to commit—or if it found both—Feldman's conviction would be the same: one count of conspiracy to commit money laundering. Nor did the first jury's finding that Feldman conspired to transmit funds internationally to promote wire fraud logically exclude a finding that the same conspiracy embraced the additional purpose to conceal the proceeds of wire fraud. In this circumstance, we can hardly consider the first jury verdict to imply a partial acquittal.

The second and broader holding of *Green*—that the dismissal of the jury "without returning any express verdict" on the first-degree-felony-murder charge and without the defendant's consent terminated jeopardy, 355 U.S. at 191—also does not govern this appeal because Feldman implicitly consented to the jury's dismissal. This second holding was based on the rule of *Wade v. Hunter*, 336 U.S. 684 (1949), that "a defendant is placed in jeopardy once he is put to trial before a jury so that if the jury is discharged without his consent he cannot be tried again," *Green*, 355 U.S. at 188; *see also Wade*, 336 U.S. at 689, barring "unforeseeable circumstances" that require a mistrial, *Wade*, 336 U.S. at 689. Although *Green* did not discuss the "consent" element of this rule in any detail, the question when a defendant consents to a jury's dismissal has often arisen in decisions dealing with mistrials, a line of caselaw based on the same rule that *Green* applied from *Wade*. *See United States v. Jorn*, 400 U.S. 470, 484–85 (1971) (citing *Wade*, 336 U.S. at

16

689, for the proposition that jeopardy terminates when "the judge, *acting without the defendant's consent*, aborts the proceeding," and explaining that "a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution" (emphasis added)); *see also Arizona v. Washington*, 434 U.S. 497, 505 (1978) ("The prosecutor must demonstrate 'manifest necessity' for any mistrial declared *over the objection of the defendant*." (emphasis added)). We agree with the Fourth Circuit that these contexts demand a unified approach, so "[w]e hold that the double jeopardy rules that apply in mistrial situations also apply when a court fails to try a discrete portion of the case before the original jury." *Ham*, 58 F.3d at 83.

To whatever extent the district court might be said to have "fail[ed] to try a discrete portion of [Feldman's] case before the original jury," Feldman impliedly consented to that failure. We have long recognized that a defendant's consent to a mistrial "need [not] be express" but "may always be 'implied from the totality of circumstances.'" *United States v. Puleo*, 817 F.2d 702, 705 (11th Cir. 1987) (quoting *United States v. Goldstein*, 479 F.2d 1061, 1067 (2d Cir. 1973)). At the charge conference during Feldman's first trial, the district court explained its intention to instruct the jury that to return a verdict of guilty on the count of conspiracy to commit money laundering, it needed to find only that the defendants agreed to commit one of the two target offenses. Feldman never voiced any

17

objection to this instruction. Indeed, during deliberations, when the jury asked the district court to clarify whether it could find the defendants guilty under either money-laundering theory or both, Feldman explicitly agreed that the jury "could find [the defendants] guilty of either, or both," as long as the jurors "unanimously agree[d] on the object that they [were] deciding on." And Feldman never voiced any objection to the jury's dismissal after the verdict. The totality of these circumstances compels the conclusion that Feldman impliedly consented to the dismissal of the original jury without its having made a finding about whether he conspired to commit money laundering under the concealment-based theory. And this conclusion suffices to establish that *Green*'s second holding does not govern this appeal. *See Green*, 355 U.S. at 188, 191; *Puleo*, 817 F.2d at 705. The Double Jeopardy Clause did not bar the concealment-based theory of conspiracy to commit money laundering.

### B. Sufficient Evidence Supports Feldman's Convictions.

Feldman contends that the evidence presented at trial was insufficient to support his convictions, but we disagree. "[I]n reviewing the sufficiency of the evidence underlying a conviction, we consider the evidence 'in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor,'" and our review "inquires only whether a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."

18

*United States v. Broughton*, 689 F.3d 1260, 1276 (11th Cir. 2012) (quoting *United States v. DuBose*, 598 F.3d 726, 729 (11th Cir. 2010)). Sufficient evidence supports Feldman's conviction for conspiracy to commit wire fraud, 18 U.S.C. §§ 1343, 1349, and his conviction for conspiracy to commit money laundering by concealment and international transmission of funds, *id.* § 1956(a)(1)(B)(i), (a)(2)(A), (h).

1.  Sufficient Evidence Supports Feldman's Conviction for Conspiracy to Commit Wire Fraud.

To convict Feldman of conspiracy to commit wire fraud, 18 U.S.C. § 1349, the government had to prove "(1) a conspiracy to commit [wire fraud]; (2) knowledge of the conspiracy; and (3) that [Feldman] knowingly and voluntarily joined the conspiracy." *Gonzalez*, 834 F.3d at 1220. The elements of wire fraud are that the defendant "devised or intend[ed] to devise any scheme or artifice to defraud" and that the defendant "transmit[ted] or cause[d] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343; *see also United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003). "To prove a conspiracy to commit wire fraud, the government need not demonstrate an agreement specifically to use the interstate wires to further the scheme to defraud; it is enough to prove . . . that the use of the interstate wires in furtherance of the scheme was reasonably

19

foreseeable," provided the government "prove[s] that the defendant knowingly and voluntarily agreed to . . . a scheme to defraud." *Hasson*, 333 F.3d at 1270. A conspiracy charge under section 1349 "does not require the commission of an overt act." *Gonzalez*, 834 F.3d at 1220.

Feldman admits that the evidence established his agreement to lure customers to the nightclubs using the B-girls, who then used a variety of misleading or deceptive tactics to keep customers from realizing how much they were spending, but he insists that the tactics within the scope of his agreement were not fraudulent under *Takhalov* and that any fraud the B-girls committed was outside of the scope of his agreement. For example, Feldman admits that "B-girls sought to keep customers from pursuing price concerns," but he argues that "[t]here was no evidence . . . that anyone lied to customers about prices" and the bartenders gave customers the drinks they ordered. Feldman also does not dispute that the B-girls committed fraud if they sometimes forged customers' signatures on credit-card receipts, but he points out that even Simchuk testified that such forgeries were not part of the scheme.

We need not review every alleged tactic of the B-girls to conclude that the evidence is sufficient to support Feldman's conviction of this charge. Based on Simchuk's testimony, the jury rationally could have found that Feldman knowingly participated in a scheme to charge customers for drinks they did not order, to lie to

20

customers about the number and kind of drinks they were being charged for, and to lie to credit-card companies about the drinks patrons had ordered. Simchuk repeatedly testified that once a patron made the mistake of providing his credit card to a bartender, it would "be charged for bottles he didn't order," that "this happen[ed] at Stars Lounge," and that Feldman "was aware of this" and knew "exactly what[] [was] going on there." Simchuk described a particular ruse in which bartenders would tell patrons that they were receiving two bottles of champagne for the price of one but charge them for both after they accepted the "free" bottle, and although he was describing his clubs in Latvia when he testified about this trick, he testified immediately afterward that he brought "exactly the same system" to Miami. Simchuk also testified that the "bartender's job was [to] open up the tab and clean up the credit card." He used the phrase "clean up the credit card" more than once, and, when the government asked him what it meant, he replied, "That's what I mean, run the credit card until it stopped. . . . Just charge it." A rational jury could have inferred from Simchuk's testimony that once a patron provided his credit card to a bartender, it was a foregone conclusion that the club would charge it to the credit limit or to as near the credit limit as possible, no matter how many drinks the patron actually ordered. In Simchuk's words, once a customer ordered even a single drink, "[b]artender went to bar, open up the tab, let the guy sign, that's it, credit card gone."

21

Simchuk testified about a scheme to commit what qualifies as fraud under any interpretation of the wire-fraud statute, and he testified that Feldman knowingly participated in that scheme. "The jury was entitled to credit his testimony." *United States v. Anderson*, 782 F.2d 908, 913 (11th Cir. 1986). In considering the sufficiency of the evidence, our only task is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Sufficient evidence supports the jury's finding that Feldman conspired to commit wire fraud.

### 2.  Sufficient Evidence Supports Feldman's Conviction for Conspiracy to Commit Money Laundering.

The jury found that Feldman conspired to commit money laundering in two ways: first, by knowingly "conduct[ing] . . . financial transaction[s]" that "involve[d] the proceeds of specified unlawful activity," that is, wire fraud, and that were "designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds," 18 U.S.C. § 1956(a)(1)(B)(i), and, second, by transferring funds internationally "with the intent to promote the carrying on of specified unlawful activity," that is, wire fraud, *id.* § 1956(a)(2)(A). Sufficient evidence supports Feldman's conviction under either theory.

The government presented sufficient evidence to establish that Feldman conspired to conceal the ownership and control of funds that he knew to be the

22

proceeds of wire fraud. Simchuk testified that Feldman created a limited-liability company, Ieva Marketing LLC, to facilitate paying the B-girls in cash so as to avoid paying taxes on their salaries and commissions. He explained that the purpose of the company, which Feldman understood, was "to avoid showing the IRS or anyone else looking that [Simchuk and Feldman] had B-girls working for [them]." Kim Marks, Feldman's accountant, testified that he filed articles of organization for Ieva Marketing at the request of either Feldman or his sister and bookkeeper, Alex Burrlader. The articles listed Ieva Marketing's address as the office of Feldman's realty company. Based on this evidence and its rational finding that Feldman knowingly joined a scheme to commit wire fraud, the jury rationally could have inferred that Feldman knowingly conspired to conduct financial transactions that involved the proceeds of wire fraud and that were designed to conceal the ownership and control of those proceeds.

The government also presented sufficient evidence to establish that Feldman conspired to promote wire fraud through international transactions. Simchuk testified that Stars Lounge received investment money from and distributed proceeds to investors in Europe, including Simchuk's mother, Eleonora, and his business partner, Andrejs Romanovs. Simchuk testified that these payments were integral to the functioning of the club because, without the distribution of profits, he and Romanovs would have withdrawn from the enterprise. When Stars Lounge

first opened its bank account, the two signatories were Eleonara Simchuk and Burrlader. Simchuk testified that Burrlader's presence on the account was "a part of [the] deal" between him and Feldman because Feldman "want[ed] to make sure [that] he [could] control the bank." Based on this evidence and its rational finding that Feldman knowingly joined a scheme to commit wire fraud, the jury rationally could have inferred that Feldman conspired to transfer funds internationally to promote the wire fraud committed at Stars Lounge.

### C.  Feldman Can Establish No Reversible Constructive Amendment of the Indictment's Wire-Fraud-Conspiracy Count.

The Fifth Amendment to the Constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. This clause does not "permit a defendant to be tried on charges that are not made in the indictment against him" or convicted on theories that the indictment "cannot fairly be read as charging." *Stirone v. United States*, 361 U.S. 212, 217 (1960). The "constructive amendment" of an indictment "'occurs when the essential elements of the offense contained in the indictment are altered'"—for instance, by a faulty jury instruction—"'to broaden the possible bases for conviction beyond what is contained in the indictment.'" *United States v. Madden*, 733 F.3d 1314, 1318 (11th Cir. 2013) (quoting *United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990)). "An error of this magnitude is *per se* reversible because it violates the defendant's

24

constitutional right to be tried solely on the charges returned by the grand jury." *United States v. Johnson*, 713 F.2d 633, 643 (11th Cir. 1983). Constructive amendments should be distinguished from "material variances" between the allegations in the indictment and the proof at trial, which are not reversible *per se*. *See id.* at 643 n.9; *United States v. Salinas*, 654 F.2d 319, 323 (5th Cir. 1981).

Feldman argues that the wire-fraud-conspiracy count of the indictment was constructively amended in three ways: by the government's redaction of the indictment, by the district court's jury instructions, and by the government's arguments at trial. He contends that the grand jury indicted only on the fraud theory that we rejected in *Takhalov*—that the B-girls' concealment of their relationship with the clubs was an act of fraud—so his conviction on any other basis rests on a fraud theory not contemplated by the grand jury. These arguments fail.

First, Feldman contends that the wire-fraud-conspiracy count in the redacted indictment differs from the wire-fraud-conspiracy count in the original indictment "to the point that the prosecution theory diverged from that determined by the grand jury." But the two counts are identical—to the word—in every material respect, so the government's redaction of the indictment cannot have changed the nature of the charge.

25

Second, Feldman contends that the wire-fraud-conspiracy count was constructively amended by the district court's jury instruction that encouraging customers to drink to overintoxication could be fraud, but the doctrine of invited error bars Feldman from complaining of this instruction. After the district court read its proposed instruction and gave Feldman an opportunity to object, his counsel acquiesced in the instruction, stating, "that's fine." Under our precedent, "when a party agrees with a court's proposed instructions, the doctrine of invited error applies, meaning that review is waived even if plain error would result." *United States v. Frank*, 599 F.3d 1221, 1240 (11th Cir. 2010); *see also United States v. Silvestri*, 409 F.3d 1311, 1337 (11th Cir. 2005) ("When a party responds to a court's proposed jury instructions with the words 'the instruction is acceptable to us,' such action constitutes invited error." (glossing *United States v. Fulford*, 267 F.3d 1241, 1246–47 (11th Cir. 2001))). Feldman cannot obtain reversal based on a jury instruction that he affirmatively accepted, so we need not consider whether the instruction was erroneous.

Finally, Feldman argues that the government's arguments at trial impermissibly broadened the basis for conviction, but this argument fails because the indictment substantially charged every or nearly every potentially fraudulent tactic that the government proved at trial and about which Feldman complains on appeal. To the limited extent that minor discrepancies may exist between the

26

allegations of the indictment and the corresponding parts of the government's evidence at trial—for instance, one could cavil whether the indictment's allegation that B-girls forged customers' signatures contains the slightly distinct charge, of which evidence was presented at trial, that B-girls sometimes helped guide an intoxicated patron's hand when he was signing a receipt—such details would be grist for a variance argument, not a constructive-amendment argument. *See* 3 Charles Alan Wright et al., *Federal Practice and Procedure* § 516, at 45 (4th ed. 2011) ("The term variance applies when the difference between the indictment and proof is relatively slight, and the term constructive amendment applies when the difference is more significant."). And Feldman has not established that any such minor variances in the government's evidence caused him prejudice. *See Salinas*, 654 F.2d at 323 ("[A] variance in the proof justifies reversal only where the defendant has been prejudiced thereby.").

### D. Prosecutorial Allusions to Oliver Twist *Did Not Deprive Feldman of Due Process.*

Feldman, who is Jewish, contends that he was deprived of due process by several comments in which prosecutors drew an analogy between his conduct and that of Fagin, the street criminal in Charles Dickens's *Oliver Twist*, who is also Jewish. To be sure, a prosecutor's exploitation of racial or ethnic animus can deprive a defendant of a fair trial, *see, e.g.*, *United States v. Sanchez*, 482 F.2d 5, 8 (5th Cir. 1973) (reversing a conviction because the prosecutor's argument was

27

"inflammatory and seriously prejudicial," being "replete with racial and political undertones" that included repeated references to the defendant's "chicannismo [sic]"), but nothing of the kind happened to Feldman.

The government never referred to Fagin's or Feldman's ethnicity, and it is clear from the record that it neither intended to trade nor inadvertently traded on an ethnic stereotype in order to prejudice Feldman. The government first used Fagin as an example when it asked prospective jurors whether they understood that someone who masterminds a crime is guilty even if he employs someone else to commit the crime on his behalf. A few moments later, the government made another fleeting reference to Fagin to inquire whether a prospective juror would be unwilling to credit a witness's testimony just because the witness was himself a criminal. The government referred to Fagin only once more, when, in its rebuttal closing argument, it compared both Feldman and its own witness Simchuk—who, at least as far as the record reflects, is not Jewish—to the Dickensian villain. Feldman did not object to the government's remarks at trial, so we review their propriety only for plain error, *see Gonzalez*, 834 F.3d at 1217, and under that deferential standard, Feldman cannot establish that the prosecutors' brief, anodyne references to a literary character deprived him of a fair trial and caused him substantial prejudice.

28

*E.  Feldman Has Established No Reversible Sentencing Error.*

Feldman contends that the district court committed both procedural and substantive sentencing errors. He challenges the eight-level loss-amount enhancement, the two-level ten-or-more-victims enhancement, the two-level obstruction-of-justice enhancement, and the two-level sophisticated-money-laundering enhancement. And he argues that his sentence is substantively unreasonable. We disagree and address these issues in turn.

1.  The District Court Did Not Clearly Err when It Applied the Loss-Amount and Ten-or-More-Victims Enhancements.

Feldman challenges both his loss-amount and ten-or-more-victims enhancements. The Sentencing Guidelines provide an eight-level enhancement for a loss amount greater than $95,000 but not greater than $150,000. *See* U.S.S.G. § 2B1.1(b)(1)(E). For purposes of this enhancement, "loss is the greater of actual loss"—that is, "the reasonably foreseeable pecuniary harm that resulted from the offense"—and "intended loss"—that is, "the pecuniary harm that the defendant purposely sought to inflict." *Id.* § 2B1.1 cmt. n.3(A)–(A)(ii)(I). Pecuniary harm is "harm that is monetary or that otherwise is readily measurable in money," *id.* § 2B1.1 cmt. n.3(A)(iii), and is reasonably foreseeable if "the defendant knew or, under the circumstances, reasonably should have known," that it "was a potential result of the offense," *id.* § 2B1.1 cmt. n.3(A)(iv). The Guidelines also prescribe a two-level enhancement for an offense that "involved 10 or more

29

victims." *Id.* § 2B1.1(b)(2)(A)(i). As relevant to this appeal, "'[v]ictim' means any person who sustained any part of the actual loss." *Id.* § 2B1.1 cmt. n.1 (subdivision omitted). Because the application of these two enhancements rested on the same evidence, we discuss them together.

The district court did not clearly err when it found that the loss amount was greater than $95,000 and that the number of victims was at least ten. After the second jury found Feldman guilty, the government prepared a list of 52 alleged victims and their alleged actual losses, which totaled $115,404.60. The government explained that the list identified individuals who "either disputed the charges as fraudulent with their credit card companies, were observed by law enforcement officers being defrauded at VIP or Stars Lounge, or confirmed with the U.S. Attorney's office or the FBI that they were defrauded." At the sentencing hearing, Feldman objected that the government had not established that all of the alleged losses resulted from "actionable fraud." But he conceded that if the district court "[went] with what the government's view is," the government's list reflected "the appropriate amount of money that would be indicated in" the evidence. Based on that concession, the district court needed to infer only that it was more likely than not that someone who disputed a charge as fraudulent or was identified as a fraud victim by law enforcement was indeed a fraud victim, and Feldman has not shown that the district court committed clear error in so inferring.

30

2.  The District Court Did Not Clearly Err in Applying the Obstuction-of-
Justice Enhancement Based on Its Finding that Feldman Committed
Perjury at His First Trial.

The Guidelines prescribe a two-level enhancement for a "defendant [who]

willfully obstructed or impeded, or attempted to obstruct or impede, the

administration of justice with respect to the investigation, prosecution, or

sentencing of the instant offense," U.S.S.G. § 3C1.1, which includes a defendant's

attempt to escape conviction by perjury, *see id.* § 3C1.1 cmt. n.4(B); *see also*

*United States v. Dunnigan*, 507 U.S. 87, 92–94 (1993). To apply the enhancement

based on a defendant's false testimony, "a district court must review the evidence

and make independent findings necessary to establish a willful impediment to or

obstruction of justice, or an attempt to do the same, [by] perjury." *Dunnigan*, 507

U.S. at 95. That is, the district court must make findings sufficient to establish that

the defendant gave "false testimony concerning a material matter with the willful

intent to provide false testimony, rather than as a  result of confusion, mistake, or

faulty memory." *Id.* at 94.

Feldman argues that the findings by the district court were too

"generalized," but he overstates its procedural burden. In *Dunnigan*, the Supreme

Court explained that "it is *preferable* for a district court to address each element of

the alleged perjury in a separate and clear finding," but it "is sufficient" when "the

court makes a finding . . . that encompasses all of the factual predicates for a

31

finding of perjury." *Id.* at 95 (emphasis added). And we have explained that "a remand is not necessary" when "the record clearly reflects the basis for [an] enhancement and supports it." *United States v. Taylor*, 88 F.3d 938, 944 (11th Cir. 1996). At Feldman's first sentencing hearing, the district court stated its finding, "based upon [the] the close attention that [the district court] paid throughout the eleven weeks of the trial, that Mr. Feldman perjured himself on numerous occasions." And the district court found at the second sentencing hearing that Feldman had "commit[ted] specific acts of perjury" "for the same reasons [the district court] articulated at the time of the first sentencing." These findings were adequate as long as the record clearly reflects that the district court found willfulness, falsity, and materiality and that a sufficient basis supports each element. *See Dunnigan*, 507 U.S. at 94–95; *Taylor*, 88 F.3d at 944.

The record reflects that the district court found that Feldman's testimony was perjured because it believed that Simchuk's testimony, which contradicted Feldman's on several material points, was "truthful[]." To give one of many examples, Simchuk testified at the first trial that he explained to Feldman how Ieva Marketing would work as the cash funnel for the B-girls and that he should arrange to create the company once Koncilo had arrived in the United States. To make sure that Feldman understood the company's function, Simchuk testified that he made Feldman explain to Burrlader exactly how Ieva Marketing was supposed to work.

32

By contrast, Feldman denied under oath that "Simchuk asked [him] to set up a separate company to see to it that the promoters [that is, the B-girls] got paid." Instead, he testified that he referred Koncilo to his accountant to set up a company only because she had asked him to do so.

When a government witness's testimony about material facts "directly contradict[s]" that of the defendant, the district court may credit the government witness's testimony and find that the defendant's was perjured. *United States v. Dobbs*, 11 F.3d 152, 155 (11th Cir. 1994). The district court did so, and we cannot say that it clearly erred in believing Simchuk over Feldman.

### 3.  The District Court Did Not Err when It Applied the Sophisticated-Money-Laundering Enhancement.

The Guidelines prescribe a two-level enhancement for a money-laundering offense that "involved sophisticated laundering." U.S.S.G. § 2S1.1(b)(3). "'[S]ophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense"; it "typically involves the use of fictitious entities; shell corporations; two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or offshore financial accounts." *Id.* § 2S1.1 cmt. n.5(A) (subdivisions omitted).

The district court did not err when it applied this enhancement based on Feldman's use of Ieva Marketing as a cash funnel for the B-girls' salaries and

33

commissions. Feldman contends that a single-member, publicly registered limited-liability company providing only one layer of insulation for the clubs' transactions is too simple a means of laundering to qualify for the enhancement, but we have affirmed sophisticated-means enhancements for schemes that were no more complex. *See United States v. Campbell*, 491 F.3d 1306, 1315–16 (11th Cir. 2007) (defendant used campaign accounts and other people's credit cards to conceal cash expenditures); *United States v. Barakat*, 130 F.3d 1448, 1457 (11th Cir. 1997) (defendant concealed funds in an attorney's trust account). And Feldman's offense conduct falls within the application note's description of sophisticated money laundering involving "two or more levels (i.e., layering) of transactions." U.S.S.G. § 2S1.1 cmt. n.5(A)(iii).

### 4.  We Need Not Consider the Substantive Reasonableness of Feldman's Sentence.

Feldman argues that his above-guideline sentence is substantively unreasonable, but we disagree. The district court considered the statutory sentencing factors, *see* 18 U.S.C. § 3553(a), and concluded that "a very significant sentence is appropriate in light of the scope of this conspiracy [and] the significant harm that this crime caused to [the] community and the customers and [the] tourist industry." The district court drew attention to Feldman's perjury, stating that "we have to have a system of justice that imposes serious consequences to people who do that." And the district court found that Feldman "ha[d]n't shown any remorse."

34

The factual findings supporting the reasoning of the district court are not clearly erroneous. As we have already explained, the district court did not clearly err when it found that Feldman had perjured himself. Nor did it clearly err when it found that Feldman was not remorseful. True, at the first sentencing hearing, Feldman stated that he "t[ook] full responsibility" for his "bad judgment to get in this business," and his attorney stated at the second sentencing hearing that Feldman "fe[lt] ashamed of himself." But Feldman always insisted that he "never intended . . . to cheat or to defraud anybody." The district court reasonably interpreted these equivocal expressions of shame to mean that Feldman refused to admit that "[he] kn[e]w [he] did something wrong." Feldman argues that he "did as much as he could to express remorse without effectively waiving his right to pursue substantial appellate claims," but this suggestion is unpersuasive. Feldman could have expressed that he felt bad about what happened to the nightclubs' customers—who, at a minimum, were lured to the nightclubs by deception and led to spend outrageous sums of money on alcohol the price of which they were discouraged from ascertaining until it was too late—even while arguing that what befell them did not satisfy the statutory definition of fraud, that he did not know about it, or both. He never did so. The district court did not clearly err in finding that Feldman failed to exhibit remorse.

35

Findings that a defendant lacks remorse and committed perjury to escape conviction are a valid basis for an upward variance. *See United States v. Mateos*, 623 F.3d 1350, 1367 (11th Cir. 2010) (affirming 360-month sentence, an upward variance from the guideline range of 216 to 262 months, based in part on the "significant" factors that the defendant lacked remorse and that she committed perjury). Feldman argues that a district court must find "extraordinary circumstances" before varying upward based on perjury from a guideline range that already incorporates an obstruction-of-justice enhancement, but no such requirement exists. *See id.* at 1368–69 (affirming upward variance based in part on perjury even though the obstruction-of-justice enhancement was applied). On the contrary, a defendant's perjury at trial speaks directly to important sentencing factors—including the "characteristics of the defendant," "respect for the law," and the ability of the criminal-justice system "to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(1), (a)(2)(A)–(B)—"and it is within [the district] court's discretion to decide how much weight to give each of the § 3553 factors." *Mateos*, 623 F.3d at 1369. "Giving that decision the deference it is due, we cannot say that [Feldman's] sentence is outside the range of reasonable sentences, or that the district court committed a clear error of judgment in imposing it." *Id.*

## IV. CONCLUSION

We **AFFIRM** Feldman's convictions and sentence.

36

WILLIAM PRYOR, Circuit Judge, concurring:

Obviously, I join the panel opinion in full. I write separately to express some concerns about our puzzling opinion in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir.), *modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016). In *Takhalov*, we held that the district court committed reversible error when it failed to instruct the jury that the defendants' "[f]ailure to disclose the financial arrangement between the B-girls and the Bar, in and of itself, [was] not sufficient to convict" them of wire fraud. *Id.* at 1311 (first alteration in original). But our opinion sends mixed signals about precisely what we thought the proposed instruction meant in context, and it endorsed a narrow construction of the phrase "scheme or artifice to defraud," 18 U.S.C. § 1343, that is difficult to understand. That statutory phrase incorporates the "well-settled," traditional common-law meaning of "actionable 'fraud.'" *Neder v. United States*, 527 U.S. 1, 22 (1999). Our conclusion in *Takhalov* that it "refers only to those schemes in which a defendant lies about the nature of the bargain itself," "primar[il]y" by misrepresenting "the price" or "the characteristics of the good," 827 F.3d at 1314, has no obvious basis in the common law of fraud. Indeed, depending on how our opinion is interpreted, its analysis may well be at odds with both the common law and binding precedent. In future prosecutions under the federal criminal-fraud

37

statutes, the bench and bar should exercise due care in interpreting our opinion in *Takhalov* and determining its precedential value.

The Supreme Court has made clear that the statutory phrase "scheme or artifice to defraud"—a staple of the federal criminal-fraud statutes, *see, e.g.*, 18 U.S.C. § 1341 (mail fraud); *id.* § 1344 (bank fraud)—incorporates the traditional common-law meaning of fraud. "[W]hen Congress enacted the [various] fraud . . . statutes, actionable 'fraud' had a well-settled meaning at common law." *Neder*, 527 U.S. at 22. And "we must *presume*" "that Congress intend[ed] to incorporate [that] well-settled meaning." *Id.* at 23; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 53, at 320 (2012) ("A statute that uses a common-law term, without defining it, adopts its common-law meaning."). After all, "[w]hen a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (some internal quotation marks omitted) (quoting indirectly Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)). And few legal terms, if any, have deeper common-law roots than "fraud" and its derivatives. *See generally* 2 Matthew Bacon, *A New Abridgment of the Law* 593–612 (1736); *see also Weiss v. United States*, 122 F.2d 675, 681 (5th Cir. 1941) (observing that fraud "is as old as falsehood and as versable as human ingenuity").

38

Although common-law authorities state the elements of actionable fraud in slightly different ways, all agree on the following "fairly exact meaning":

> [A] false representation of a material fact made by one who knew that it was false or in some cases . . . when he knew that he had not information sufficient to warrant his belief in the truth of such statement, made to one who did not know that it was false, with intent to deceive such person and to influence his action, which did deceive such person and influence his action to his damage.

1 William Herbert Page, *The Law of Contracts* § 217, at 320–21 (2d ed. 1920) [hereinafter *Page on Contracts*]; *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 105, at 728 (5th ed. 1984) [hereinafter *Prosser and Keeton on Torts*]; *Restatement (Second) of Contracts* § 162 (1981); *Restatement (Second) of Torts* §§ 525–26 (1977); 2 James Fitzjames Stephen, *A History of the Criminal Law of England* 121–22 (1883); 1 Joseph Story, *Commentaries on Equity Jurisprudence* § 192, at 201 (1836). This set of elements defines fraud both when it is used as a sword, as in the tort claim of deceit, *see Restatement (Second) of Torts* § 525, and when it is used as a shield, for instance, to avoid a contract, *see Restatement (Second) of Contracts* § 164. *See* 37 Am. Jur. 2d *Fraud and Deceit* § 368, at 408 (2013) ("The essentials of actionable fraud are generally the same for setting it up as a defense as for asserting it as the basis of an action for damages." (footnotes omitted)); 1 *Page on Contracts* § 217, at 321 (explaining that "'fraud' . . . has substantially the same elements" in contract as in tort).

Consistent with this common-law definition, the words "to defraud" in the federal fraud statutes "signify the deprivation of something of value by trick, deceit, chicane or overreaching"; in other words, "[t]hey refer . . . to wronging one in his property rights by dishonest methods or schemes." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924). Indeed, the only way in which the phrase "scheme or artifice to defraud" differs from actionable fraud at common law follows from the phrase itself: because the statutes address "the 'scheme to defraud,' rather than the completed fraud, the elements of [actual] reliance and damage would clearly be inconsistent with the statutes Congress enacted." *Neder*, 527 U.S. at 25. That is, whether a defendant has schemed to defraud—and so violated the fraud statutes—does not depend on the success of his scheme or its consequences. *See United States v. Brown*, 79 F.3d 1550, 1557 n.12 (11th Cir. 1996), *overruled on other grounds by United States v. Svete*, 556 F.3d 1157 (11th Cir. 2009) (en banc). In this respect, the statutes punish frauds that would not have been "actionable" at common law. *See United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932) (Hand, J.) ("Civilly of course the action would fail without proof of damage, but that has no application to criminal liability."); *see also Pasley v. Freeman* (1789) 100 Eng. Rep. 450, 453 (KB) (opinion of Buller, J.) ("Fraud without damage, or damage without fraud, gives no cause of action; but where these two concur, an action lies."). But as far as the scheme itself is concerned—

40

that is, the acts that the defendant intends to perform and the consequences he intends to result from them—the word "defraud" retains its "well-settled" common-law meaning. *Neder*, 527 U.S. at 22; *see also Svete*, 556 F.3d at 1162–65 (drawing on common-law sources to hold that a representation need not be objectively reliable to satisfy the materiality element of the phrase "scheme or artifice to defraud").

*Takhalov* is difficult to square with this common-law backdrop. To be sure, the bottom-line *holdings* of *Takhalov* are straightforward enough. We held that the district court reversibly erred when it declined the defendants' request for the following jury instruction: "Failure to disclose the financial arrangement between the B-girls and the Bar, in and of itself, is not sufficient to convict a defendant of any offense." 827 F.3d at 1311 (alterations omitted or adopted). That is, we held that the instruction was "a correct statement of the law," *id.* at 1315–16; that it dealt with a critical matter raised at the trial, *see id.* at 1316–17; that it was not substantially covered by the district court's other instructions to the jury about the elements of wire fraud, *see id.* at 1317–20; and that the failure of the district court to give the instruction was not harmless beyond a reasonable doubt, *id.* at 1320–25.

Although the holdings of *Takhalov* may be easy to understand, its reasoning is less so. Before examining the opinion, consider the jury instruction itself. On its face, the proposition that "[f]ailure to disclose the financial arrangement between

41

the B-girls and the Bar, in and of itself, is not sufficient to convict a defendant of any offense" is obviously correct. After all, a mere "failure to disclose" information is typically insufficient to satisfy even the misrepresentation element of fraud. For nondisclosure to be equivalent to a misrepresentation, it must be coupled with special circumstances, such as a confidential relationship between the parties or a course of affirmative representations making the omission misleading, that justify the imposition of a duty to disclose. *See Prosser and Keeton on Torts* § 106, at 737–40; 37 Am. Jur. 2d *Fraud and Deceit* § 194, at 235–37. And even when it is tantamount to a misrepresentation, a failure to disclose is *never* "in and of itself" sufficient to prove a scheme to defraud; the misrepresentation must also be material, made with scienter, and intended to induce detrimental reliance.

But our opinion in *Takhalov* reads as if we equated the requested jury instruction with one about the insufficiency of affirmative misrepresentations concededly made with the intent to influence customers, and it appears to equivocate about what precisely we thought the defendants had intended. At first glance, many passages in the opinion suggest that we understood the instruction to mean that the defendants would not have schemed to defraud if the *only* way they intended the concealment of the B-girls' employment status to affect customers was by influencing them *merely to set foot in* the nightclubs. *See, e.g.*, 827 F.3d at 1310–11 (narrating that the defendants "tricked men to come into the defendants'

42

clubs" and "admitted that they knew the B-girls concealed their relationship with the clubs to persuade the men to go to the clubs"); *id.* at 1311 (narrating that the defendants "knew the B-girls were posing as tourists to get the men to come to the clubs with them"); *id.* (referring to "the lies that the B-girls used to get the men to come into the clubs in the first place"); *id.* at 1316 & n.8 (referring to the B-girls' "tricking the victims into coming to the bar[s]" and "tricking the victims into entering the bar[s]"); *id.* at 1318 (describing the defendants' defense theory as being that they "intended to deceive the victims in only one way—by tricking them into coming to the bars"); *id.* at 1319 ("[A] scheme to trick patrons to come into a bar—without more—is not wire fraud."). Were that all the instruction meant, it would again be obviously correct. To trick someone into merely crossing the threshold of a commercial establishment is a way of influencing his behavior by deceit, but it does not—by itself—"wrong[] [him] in his property rights," *Hammerschmidt*, 265 U.S. at 188. Until a transaction occurs, no property rights have been affected.

Despite the many passages that support this narrow reading of the instruction, other passages suggest that we took it to mean something more: that the defendants would not have schemed to defraud even if they intended the concealment of the B-girls' employment status to affect customers *both* by inducing them to set foot in the clubs *and* by inducing them to buy drinks once

43

they were there. *See Takhalov*, 827 F.3d at 1310 (paraphrasing the instruction:

"that [the jurors] must acquit if they found that the defendants had tricked the

victims into entering a transaction but nevertheless gave [them] exactly what they

asked for and charged them exactly what they agreed to pay"); *id.* at 1316

(paraphrasing the instruction: "that [the jurors] could convict only if they found

that the defendants had schemed to lie about the quality or price of the goods sold

to the victims"). Indeed, this interpretation seems necessary to explain what

appears to be an important part of our discussion.

In Part II.A.1 of our opinion, we discussed the meaning of the phrase

"scheme or artifice to defraud." *See id.* at 1312–15. We reasoned that "a schemer

who tricks someone to enter into a transaction has not 'schemed to defraud' so

long as he does not intend to harm the person he intends to trick." *Id.* at 1313. We

pursued this train of thought through a series of hypotheticals in each of which a

party intended to bring about a transaction, *see id.* at 1313–14, and from which we

drew the following conclusions:

> Thus, a "scheme to defraud," as that phrase is used in the wire-fraud
> statute, refers only to those schemes in which a defendant lies about the
> nature of the bargain itself. That lie can take two primary forms: the
> defendant might lie about the price (*e.g.*, if he promises that a good
> costs $10 when it in fact costs $20) or he might lie about the
> characteristics of the good (*e.g.*, if he promises that a gemstone is a
> diamond when it is in fact a cubic zirconium). In each case, the
> defendant has lied about the nature of the bargain and thus in both cases
> the defendant has committed wire fraud. But if a defendant lies about
> something else—*e.g.*, if he says that he is the long-lost cousin of a

44

> prospective buyer—then he has not lied about the nature of the bargain, has not "schemed to defraud," and cannot be convicted of wire fraud on the basis of that lie alone.

*Id.* at 1314. In other words, we concluded, "even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims received 'exactly what they paid for.'" *Id.* at 1315 (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)). And we identified this interpretation with a line of caselaw from the Second Circuit, *see id.* at 1314–15 (citing *Shellef*, 507 F.3d 82; *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987); *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970)), that appears to have originated in concerns about materiality, *see Regent Office*, 421 F.2d at 1182 (reversing the defendants' convictions because "the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him").

Our analysis is difficult to ground in the common law of fraud. To begin with, our failure to discuss the common law makes it hard to be sure precisely which traditional fraud elements, if any, we thought we were interpreting. Even so, making sense of *Takhalov* requires that we at least attempt to relate its conclusions in Part II.A.1 to some aspect of the traditional legal definition of fraud. The proposition that the phrase "scheme or artifice to defraud" contains some limitation

45

with absolutely no roots in the common-law definition of actionable fraud is a nonstarter. After all, we must presume that "Congress intend[ed] to incorporate the well-settled meaning of the common-law terms it use[d]" "'unless the statute otherwise dictates.'" *Neder*, 527 U.S. at 23 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992)). And our opinion in *Takhalov* does not so much as suggest that its analysis follows from some peculiarity of the wire-fraud statute that "dictates" a narrower interpretation of "defraud" than the common law would warrant. On the contrary, we believed that our discussion "follow[ed] as a matter of logic" from the word "defraud" itself. 827 F.3d at 1315; *see also id.* at 1313–14 (interpreting the word "defraud"). So, for Part II.A.1 of *Takhalov* to make sense, it must mean that one or more of the traditional elements restrict the common-law meaning of fraud "to those schemes in which a [party] lies about the nature of the bargain itself," "primar[il]y" by "l[ying] about the price" or "about the characteristics of the good." *Id.* at 1314.

The trouble is that none of the traditional fraud elements is a natural fit with our discussion in Part II.A.1. The most basic two elements, misrepresentation and scienter, are prima facie implausible candidates to be the subject of our analysis. To be sure, as I have discussed, the jury instruction that the defendants requested easily *could* be read to highlight the important difference between mere nondisclosure and potentially actionable misrepresentation. But in Part II.A.1, our

46

analysis of the phrase "scheme or artifice to defraud" assumed the existence of "a scheme *to deceive*," *id.* at 1313, and a defendant who "ha[d] lied," *id.* at 1314. The evident point of our discussion was to distinguish between those deliberate misrepresentations that may constitute a scheme to defraud—"lies about the nature of the bargain"—from those deliberate misrepresentations that cannot constitute such a scheme—"lies about something else." *Id.* It seems unlikely that we were considering what constitutes a deliberate misrepresentation in the first place.

It also seems unlikely that we were discussing the requirement that the defendant intend to influence the victim into relinquishing some property right. True, as I have explained, much of our opinion suggests that the defendants may have intended the customers to rely on the B-girls' concealment of their employment status *only* in deciding to *visit* the clubs and not necessarily in deciding to *order drinks* once they were there. But our analysis in Part II.A.1 undermines this suggestion. Our statement about "a schemer who tricks someone to enter into a transaction"—who, we reasoned, "has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick"—is most naturally read to refer to a schemer who *intends* to bring about a transaction by means of deceit. *Id.* at 1313. In the same vein, a salesman who "says that he is the long-lost cousin of a prospective buyer" presumably does so because he thinks it will facilitate a sale. *Id.* at 1314. But we stated that the salesman "cannot be

47

convicted of wire fraud on the basis of that lie alone," implying that some other element of fraud must be lacking. *Id.*

So the two most plausible ways of translating our conclusion that a "scheme or artifice to defraud" requires a misrepresentation "about the nature of the bargain itself" into common-law terms concern the elements of injury and materiality. On the injury-based reading, the thesis of Part II.A.1 is that the harm of having been tricked into a transaction, while still understanding its essential terms, is not an injury that would make fraud actionable at common law; that is, a fraudulent inducement does not "wrong[] [the victim] in his property rights," *Hammerschmidt*, 265 U.S. at 188, in the sense required for a successful fraud claim or a conviction under a criminal-fraud statute. Alternatively, on the materiality-based reading, Part II.A.1 means that a lie about something other than "the nature of the bargain" is necessarily immaterial or, put another way, that to enter a transaction in reliance on such a lie is necessarily unreasonable or unjustifiable. *See Svete*, 556 F.3d at 1164 ("As both the modern and ancient authorities on the common law cited by the [*Neder*] Court explain, materiality was understood to be a component of reasonable reliance at common law." (collecting authorities)).

Although each of these interpretations of Part II.A.1 has some plausibility, they are plausible for different reasons, and the strength of each is the other's weakness. The injury-based reading is plausible to the extent that it seems to match

48

our *reasoning*. After all, we began with the premise that "to *defraud*, one must intend to use deception to cause some injury" or, put another way, "intend to harm the person [one] intends to trick." *Takhalov*, 827 F.3d at 1313. But the injury-based reading makes less sense of our *conclusion*, which distinguished fraudulent from nonfraudulent lies based, not on their *consequences*, but on their *subject matter*. *See id.* at 1314 (distinguishing fraudulent lies "about the price" or "the characteristics of the good" from nonfraudulent "lies about something else"). Conversely, the materiality-based reading makes better sense of our conclusion— distinguishing lies based on their subject matter is what the materiality element has always done, *see Prosser and Keeton on Torts* § 108, at 753–54—but it finds little if any direct support in the reasoning of Part II.A.1. Indeed, to make matters more confusing, elsewhere in the opinion we seem to have taken it for granted that "the B-girls' relationship to the clubs" was "a material fact." *Takhalov*, 827 F.3d at 1323. *But see id.* at 1311–12 (arguably suggesting that the jury instruction concerned materiality).

Whichever reading one prefers, the overriding problem is that both the injury-based reading and the materiality-based reading are incompatible with the common law and with binding precedent. So-called "fraud in the inducement"— that is, fraud about a collateral but still material matter that persuades a victim to enter a transaction he would otherwise have avoided—has long been considered a

species of actionable fraud. Nor is materiality limited to the "nature of the bargain" representations we discussed in *Takhalov*. I address these problems in turn.

The common law has traditionally distinguished between two kinds of fraud: "fraud in the factum" and "fraud in the inducement." *See, e.g.*, *Lovato v. Catron*, 1915-NMSC-021, ¶ 7, 148 P. 490, 492. "Fraud in the factum" refers to fraud that deceives the victim about the nature of the act or transaction—for example, "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents." *Langley v. Fed. Deposit Ins. Corp.*, 484 U.S. 86, 93 (1987). By contrast, "[f]raud in the inducement exists where the defrauded party understands the identity of the adversary party, the consideration, the subject-matter, and the terms of the contract, and he is willing to enter into [it]; but his willingness so to enter is caused by a fraudulent misrepresentation . . . as to a material fact." 1 *Page on Contracts* § 281, at 435. Although fraud in the factum and in the inducement have different legal consequences—most significantly, fraud in the factum "makes the underlying contract *void ab initio*, whereas . . . fraud in the inducement only makes [it] voidable," *Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 994 n.13 (11th Cir. 2012) (citation omitted)—jurists have never hesitated to call both by the name of "fraud."

Fraud in the inducement fits squarely within the "well-settled meaning" of "actionable 'fraud.'" *Neder*, 527 U.S. at 22. It can support a claim for damages.

50

*See* 37 Am. Jur. 2d *Fraud and Deceit* §§ 2, 270, at 28, 316; *see also Gregg v. U.S. Indus., Inc.*, 715 F.2d 1522, 1541 (11th Cir. 1983) (applying Florida law). And it can serve as a defense to a claim. *See* 37 Am. Jur. 2d *Fraud and Deceit* § 368, at 407 ("Fraud in either the inducement or the factum . . . may be established as a defense to a claim prosecuted by the person guilty of fraud."); 1 *Page on Contracts* § 341, at 544–45 & n.2 (collecting decisions); *see also Wagner v. Nat'l Life Ins. Co.*, 90 F. 395, 404 (6th Cir. 1898).

So, if our analysis in *Takhalov* means that the federal fraud statutes punish only fraud-in-the-factum schemes, not schemes to commit fraud in the inducement, it is at odds with the common law. That fraud in the inducement has traditionally been actionable reflects the law's judgment that a person is "entitled to determine on what basis, for what reason, and under what circumstances [he] want[s] to give away" his property. *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir. 1958). As Judge Learned Hand explained nearly a century ago, "[a] man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value." *Rowe*, 56 F.2d at 749. "[H]e has suffered a wrong; he has lost his chance to bargain with the facts before him." *Id.* The Supreme Court has since confirmed Judge Hand's wisdom. *See Shaw v. United States*, 137 S. Ct. 462, 467 (2016) (quoting and endorsing *Rowe*, 56 F.2d at 749).

51

Unsurprisingly, this reading of *Takhalov* is also at odds with our precedent. To be sure, we have never expressly held that the phrase "scheme and artifice to defraud" covers fraud in the inducement as well as fraud in the factum—the argument that it covers only the latter has never been made or at least not in those terms—but our precedents reflect a clear understanding that it covers both. Take, for instance, *United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir. 1988), in which we held that an indictment charging a bid-rigging scheme for government contracts stated a "scheme or artifice to defraud," *see id.* at 1572, and that the evidence supported the convictions of the schemers, *see id.* at 1574–76. The defendants submitted fraudulent bids, which the government relied on when it selected the lowest bidder. *See id.* at 1562. But the defendants did not deceive the government about the cost of the lowest bid or the work that the winning bidder would complete. *See id.* The gravamen of the scheme to defraud, in other words, was not any misrepresentation about "the price" or "the characteristics of" the bargained-for work. *Takhalov*, 827 F.3d at 1314. Instead, it was a set of "lies about something else," *id.*—namely, that the bids were the product of competition, not collusion—intended to trick the government into entering a contract that otherwise it either would have avoided or would have negotiated on different terms.

Part II.A.1 of *Takhalov* fares no better if interpreted as a commentary on materiality. It is hornbook law that the test of materiality "cannot be stated in the

52

form of any definite rule, but must depend upon the circumstances of the transaction itself." *Prosser and Keeton on Torts* § 108, at 753. In the circumstances of a particular transaction, a misrepresentation is material either if a reasonable person would consider it important to his choice of action or if its maker knows that its recipient would likely do so. *See Neder*, 527 U.S. at 22 n.5 (quoting *Restatement (Second) of Torts* § 538(2)); *Svete*, 556 F.3d at 1164 (same); *accord Restatement (Second) of Contracts* § 162(2); *Prosser and Keaton on Torts* § 108, at 753–54; 1 *Page on Contracts* § 308, at 481–82 ("[I]t is usually held that [material representations] are all representations which . . . tend to induce the party to whom they are made, to enter into the contract."); 1 Story, *Commentaries on Equity Jurisprudence* § 195, at 204 (equating materiality with "inducement or motive to the act or omission of the other party").

Nothing about the common-law test limits materiality to misrepresentations about "the price," "the characteristics of the good," or even "the nature of the bargain itself." *Takhalov*, 827 F.3d at 1314. The phrasing of the test by the authorities suggests as much, the actionability of fraud in the inducement implies it, and a couple of common-law examples confirm it. If a parent declines to enroll his child at a school unless her classmates from a previous school have also enrolled there, the school's misrepresentation to the parent that they have done so is material, even though it does not concern the price of tuition or the

53

characteristics of the instruction. *Brown v. Search*, 111 N.W. 210, 211 (Wis. 1907). And if a vendor of portraits lies to a prospective buyer that members of the buyer's family have seen the portraits and like them, that lie too is material, notwithstanding that the buyer knows the price and characteristics of the goods. *Washington Post Co. v. Sorrells*, 68 S.E. 337, 337 (Ga. Ct. App. 1910).

The common-law courts that decided *Brown*, *Sorrells*, and many similar cases, *see Prosser and Keeton on Torts* § 108, at 753–54 & nn.45–60, also would not have held that a seller's pretense "that he is the long-lost cousin of a prospective buyer" cannot be material as a matter of law, *Takahlov*, 827 F.3d at 1314. On the contrary, it has long been established that "the identity of an individual" may be a material fact, provided—as always—either that it would be likely to influence a reasonable person or that the maker of the statement knows it would be likely to influence the recipient. *Prosser and Keeton on Torts* § 108, at 753; *see also* 1 *Page on Contracts* § 260, at 390 ("Such identity is material where the personality of the adversary party is a factor in inducing the one party to enter into the contract . . . ."). And our binding circuit precedent agrees. *See Walker v. Galt*, 171 F.2d 613, 614 (5th Cir. 1948) ("[F]raud may be predicated upon misrepresentations as to the identity of the purchaser . . . , where the vendor would not have entered into the contract had he known the true identity of the purchaser." (quoting 55 Am. Jur. *Vendor and Purchaser* § 96 (1946))); *see also United States*

54

*v. Bent*, 707 F.2d 1190, 1193 (11th Cir. 1983) ("We are bound by decisions of the former Fifth Circuit rendered prior to October 1, 1981, and by decisions of Unit B of the former Fifth Circuit rendered after that date." (citation omitted)). In short, if our discussion in Part II.A.1 of *Takhalov* interpreted the materiality element of actionable fraud, it is at odds with the traditional understanding of materiality and with the understanding reflected in our precedent.

So, on examination, the two most plausible ways of translating the analysis of Part II.A.1 into the language of the common law turn out to be doctrinal dead ends. Where does this leave us in our attempt to make sense of *Takhalov*? The connection between the jury instruction requested by the defendants, on the one hand, and the reasoning that occupies much of our opinion, on the other, is less than transparent. And the connection between that reasoning and the preexisting jurisprudence of fraud is even more obscure. To my mind, all that is clear is that the *Takhalov* panel held that the district court should have given the jury instruction and that its failure to do so was reversible error. The rationale for that decision remains an enigma.

In the light of these concerns, I encourage the bench and bar to evaluate carefully the precedential value of *Takhalov* in future prosecutions under the fraud statutes and, in doing so, to keep three principles in mind. First, the binding force of a precedent is limited to its holding, and "regardless of what a court says in its

opinion, the decision can *hold* nothing beyond the facts of that case." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) (emphasis added) (collecting decisions); *see also United States v. Johnson*, 921 F.3d 991, 1003 (11th Cir. 2019) (en banc); *New Port Largo, Inc. v. Monroe County*, 985 F.2d 1488, 1500 & n.7 (11th Cir. 1993) (Edmondson, J., concurring in the judgment). Second, the holding of any panel decision must be construed, "if at all possible," in a manner that maintains the harmony of our precedents. *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993). Third, even the holding of a panel decision is not binding precedent if it contradicts the holdings of earlier panel precedents or intervening decisions of the Supreme Court. *See United States v. Dailey*, 24 F.3d 1323, 1327 (11th Cir. 1994); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* § 36, at 304 (2016).

Notwithstanding my concerns about the reasoning of *Takhalov*, I do not mean to imply doubt about the correctness of its result. Perhaps the B-girls' representations about their employment status were immaterial to the customers' drink orders for some more precise reason than that they were not "about the price" or "the characteristics of the [drinks]." *Takhalov*, 827 F.3d at 1314. Or perhaps some other element of common-law fraud was lacking. In the last analysis—that is to say, in the light of our precedents and all that we know about the well-settled legal meaning of the word "defraud"—it may even be that *Takhalov* is best

56

understood to rest on the distinction between misrepresentation and mere nondisclosure or on the hypothesis that the defendants intended for the B-girls' concealment of their employment status to influence customers *only* by getting them in the door, not by inducing them to order drinks. True, either of those interpretations would render most of Part II.A.1 dicta. But a reading that makes dicta of large swaths of *Takhalov* is preferable to one that cannot be squared with preexisting doctrine. *See Hogan*, 986 F.2d at 1369 (We are "obligated, if at all possible, to distill from apparently conflicting prior panel decisions a basis of reconciliation and to apply that reconciled rule.").

In any event, we need not crack the riddle of *Takhalov* to resolve this appeal, and I express no ultimate opinion about its solution. But our analysis could have been much clearer had we only anchored it in the common-law meaning of the term Congress used when it enacted the federal criminal-fraud statutes.

57